RICHARD GAMBALE *vs.* COMMONWEALTH.

Suffolk. February 4, 1969. — February 28, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, & KIRK, JJ.

*Constitutional Law,* Self incrimination. *Witness,* Self incrimination.

On the record, there was no error in a conviction for criminal contempt where it appeared that the contemnor, while a witness before a grand jury investigating a stabbing in a restaurant, refused, on the ground of his constitutional privilege against self incrimination, to answer, after he had been ordered by a court to answer, questions merely inquiring what his address and age were, whether he had been in the restaurant at the time of the stabbing, whether he had seen certain

persons there, as to what he had observed and heard there, whether he had then been employed there, and as to how long he had known certain persons.

PETITION filed in the Supreme Judicial Court for the county of Suffolk on November 17, 1966.

The case was heard by *Reardon*, J.

*Chester C. Paris* for the petitioner.

*Bruce G. McNeill*, Deputy Assistant Attorney General (*Willie J. Davis*, Assistant Attorney General, with him), for the Commonwealth.

WILKINS, C.J. On September 22, 1966, pursuant to summons Gambale appeared before the Suffolk County grand jury. When he refused to answer certain questions on the ground that his answers might tend to incriminate him contrary to the Fifth Amendment, he was brought before a judge of the Superior Court, who directed him to answer. On the same date he again went before the grand jury, where once more he refused to answer questions. On September 29, 1966, he was found guilty of criminal contempt by the same Superior Court judge on a petition by the grand jury entitled, "The Grand Jury Currently Sitting in and for the County of Suffolk v. Richard Gambale," and was sentenced to serve one year in the common jail. Gambale filed a petition for writ of error in the county court, where the single justice ordered judgment on the petition by the grand jury to be affirmed. The petitioner excepted.

The grand jury were investigating the stabbing of Arthur Pearson at the Tiger's Tail Restaurant (the club) in Revere on July 24, 1966. Gambale refused to answer all questions except his name [1] on the ground, he said, that the answers might tend to incriminate him.

---

[1] "Q. What is your name? Q. What is your address? Q. What is your age? Q. On or about July 24, 1966, were you in the Tiger's Tail Restaurant? Q. If so, did you have an occasion to see Arthur Pearson, Bonnie Burnside, Janis Costa, Charles Crafts, Joseph Barboza, Nicholas Femia, and Joseph Amico? Q. Did you witness an argument between Arthur Pearson and Joseph Barboza, Nicholas Femia, and Joseph Amico? Q. Did you hear Joseph Barboza, Nicholas Femia, or Joseph Amico threaten Arthur Pearson? Q. How long have you known Joseph Barboza, Nicholas Femia and Joseph Amico? Q. Were you, on or about July 24, 1966, employed by the Tiger's Tail as a doorman?"

We recently have had for decision two cases involving analogous situations where a witness refused to answer questions while claiming privilege against self-incrimination. In *Murphy* v. *Commonwealth*, 354 Mass. 81, the refusal to answer was before a grand jury, and as the record before us did not adequately give the setting in which the question was asked, we felt constrained to reverse the conviction. This was pursuant to *Hoffman* v. *United States*, 341 U. S. 479, 486–487, where it was said, "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." In *Commonwealth* v. *Baker*, 348 Mass. 60, there was a criminal trial and the refusal was to answer questions asked by counsel for the defendant.

In the *Murphy* case (p. 84) we repeated what we had said in the *Baker* case (pp. 62–63): "We are mindful that the recent decision in *Malloy* v. *Hogan*, 378 U. S. 1, has held that the Fourteenth Amendment guarantees to a witness testifying in a State court the protection of the Fifth Amendment and that Federal standards will apply in determining whether a claim of privilege is justified. Under the Federal standard it must be '"*perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency"* to incriminate.' *Malloy* v. *Hogan, supra,* at pages 11–12. . . . Whether a question calls for an incriminating answer must be determined in the setting in which it is asked."

In the *Baker* case it was clear from the setting that the witness's refusal to answer all questions except his name and address was premature. "If the questions were not of an incriminating nature they had to be answered." *Baker* case, *supra* (p. 62).

In the *Murphy* case our conclusion was (p. 84) that we were unable to say that it clearly appeared in the record that the answers of the witness "could not possibly lead to in-

jurious disclosure." In the present case, however, the setting is very clear.

At the hearing on the contempt petition Gambale testified that he was twenty-three years of age and living with his parents at an address in Boston; that he was not employed and had not been employed during 1965 or 1966; that he knew Pearson and on the night of July 24, 1966, saw him at the club; that he saw Pearson and Bonnie Burnside at the club door; that he told Pearson that Bonnie could not come in; that when Pearson tried to push his way in he struck Pearson; that he was not an employee of the club and had no right to tell him to get out; that he refused to answer those questions before the grand jury for fear that he might be held for assault and battery on Pearson; that he had been in trouble for "not filing income tax"; and that he was five feet, seven inches tall, and Pearson was much taller.

At the same hearing Pearson testified that he was at the club on July 24, 1966, arriving at 11 P.M.; that he was intoxicated; that he then weighed 235 pounds and was six feet, four inches tall; that his conduct that night was boisterous; and that Gambale did not strike him. Two other witnesses, police officers, testified that they believed that Gambale worked at the club.

The judge found as a fact that there was no assault of Pearson by Gambale, and that the income tax contention had "absolutely no merit" and was "purely speculative."

We do not rely on the finding that there was no assault, although our own belief is the same. Gambale's own testimony, on direct examination by his counsel, that he did "strike" Pearson has all the earmarks of being self-serving, especially when contrasted with Pearson's testimony that Gambale did not strike him at any time that evening. If Pearson sustained a stab wound, as the purpose of the investigation would indicate, there was no testimony or contention by anyone that Gambale did stab Pearson. The questions which Gambale declined to answer were not accusatory and did not implicate him as a participant. They

merely sought to ascertain what he observed, and answering them would not have foreclosed his right to claim privilege if later questions might incriminate him. Mere presence at the same place as Pearson at some time on July 24, 1966, is not enough to allow a claim of privilege. *In the Matter of Bommarito*, 270 Mich. 455, 457. *In re Jennings*, 154 Ore. 482, 521.

Fear of income tax prosecution was fanciful. Gambale testified that he had not been employed anywhere in 1965 and 1966. The possibility of prosecution for a crime as yet uncommitted, such as a future failure to file a tax return for the year 1966, should not be considered. See *Malloy* v. *Hogan, supra*, 33, dissenting opinion of Mr. Justice White.

Our conclusion is that Gambale's refusal to testify was unjustified.

We reach our conclusion quite aware that the court which pronounced the *Hoffman* and *Malloy* decisions has created the power to reverse at will on appeal by purporting to follow these cases and without anyone being the better informed as to the precise ground of decision. There is imperative need for intelligible guidance for courts which are trying properly to handle this important problem. Until this is forthcoming, such courts must reach their conclusions as best they may, in the meantime hoping to preserve their system of criminal law, including the grand jury.

*Exceptions overruled.*