RODERICK TAYLOR vs. COMMONWEALTH
(and a companion case [1]).

Suffolk.   September 7, 1975. — December 5, 1975.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Constitutional Law*, Self-incrimination.   *Witness*, Self-incrimination.
   *Waiver*.

In a proceeding upon a writ of error by a black juvenile to determine
    the validity of an adjudication by a District Court judge that the
    petitioner was guilty of contempt in refusing to answer questions
    in juvenile proceedings against one charged with the murder by
    stabbing of an elderly white man fishing from a beach, evidence
    of statements by the petitioner to police on the evening of the
    murder respecting a meeting of armed black youths which he
    attended preceding the attack, and that the petitioner was on the
    scene when it took place, together with newspaper accounts admit-
    ted of violent attacks by other young blacks, made it impossible
    for the Superior Court judge to conclude that it was "perfectly
    clear" that the petitioner was incorrect in invoking his constitu-
    tional privilege against self-incrimination and in refusing to answer
    the questions.   [187-188]
Statements to police by a black juvenile on the evening of a murder
    by stabbing placing another black juvenile near the scene of the
    attack and at the time thereof, together with evidence that the
    second juvenile lived only a few minutes walk away, required a
    conclusion that in the circumstances it was not "perfectly clear"
    that answers to questions put to the second juvenile, in a pro-
    ceeding charging a third juvenile with the murder, would not
    result in disclosure of information tending to incriminate the
    second juvenile, and he rightly refused to answer the questions.
    [188-190]
Statements given to police officers in the ordinary course of an investi-
    gation do not result in the waiver of the privilege against self-
    incrimination as to subsequent in-court, under-oath testimony.
    [190-191]

---

[1] Henry Funches vs. Commonwealth.

In juvenile proceedings against one charged with murder, testimony of a witness sixteen years of age who appeared voluntarily without parents or counsel and displayed reluctance and hesitancy in responding to questions by the prosecutor, eventually refusing to answer pertinent questions even after threats of being held in contempt, and who received no help from the judge as to self-incrimination and stated that he did not "understand what . . . [was] going on," was not so freely and voluntarily given as to effect a waiver of his privilege against self-incrimination when he appeared as a witness under subpoena and with counsel in a subsequent proceeding on the murder charge, and, upon the witness properly invoking the privilege, it was error to hold him in contempt.   [191-193]

PETITIONS for writs of error filed in the Supreme Judicial Court for the county of Suffolk on December 11, 1973, and December 12, 1973.

On transfer to the Superior Court, the cases were heard by *Ronan, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Wade M. Welch,* Assistant Attorney General, for the Commonwealth.

*Geraldine S. Hines* for Roderick Taylor.

*Max D. Stern* for Henry Funches.

REARDON, J.   These are two petitions for writs of error brought by juveniles held in contempt by the Municipal Court of the Dorchester District for refusal to answer questions in juvenile proceedings against a third party. After hearing, a judge of the Superior Court granted both petitions.   The cases are here on the Commonwealth's substitute outline bills of exceptions and designations, and the outline bills of exceptions and designations of the petitioners.

On October 4, 1973, a sixty-five year old man, Ludivico Louis Barba, was stabbed to death.   Considerable public attention was focused on the murder.   According to contemporary news accounts, the victim was attacked by a group of up to fifty black teenagers while he was

fishing off Columbia Point in Dorchester in an area immediately behind a shopping center known as the Bayside Mall. Both petitioners are black, were at the time sixteen years of age, and resided at the Columbia Point housing project.

On the evening of October 4, 1973, the petitioner Roderick Taylor was requested by investigating police officers to go to station 11 in Dorchester for purposes of interrogation concerning the crime. He appeared there voluntarily, accompanied by his father who remained with him throughout the period of questioning save for several minutes when he departed the room for a drink of water. After being given the *Miranda* warnings Taylor agreed to answer questions and placed himself and the petitioner Henry Funches, among others, in close proximity to the location and time of the crime. He also stated that earlier in the day he had attended a meeting of black youths at which there was discussion about "[f]ighting white people," and that later that day this group had picked up "sticks and stuff and went over to the beach" in order "[t]o fight . . . [w]hite boys."[2]

On October 5, 1973, a juvenile complaint was issued against one Hakim Williams charging him as delinquent by reason of murder, and the petitioners were called as witnesses by the Commonwealth in the resulting proceedings.

Taylor was first called to testify in the juvenile session of the Municipal Court of the Dorchester District on November 21, 1973. He appeared there voluntarily, not having been formally summonsed, and unaccompanied

---

[2] These plans were apparently motivated in response to an attack by whites on black youths which had occurred earlier that day at the Andrew Square MBTA station. It would appear that other serious attacks were perpetrated in and about Columbia Point during the course of the day. A truck driver moving furniture into the project was stabbed and seriously wounded by about twenty youths who surrounded him, and a woman also was attacked while walking her dog in the rear of the project.

by counsel or parents. On being sworn, Taylor was interrogated by the prosecutor who was soon seeking to elicit his observations of the victim Barba at a time and place in close proximity to the time and place of the crime. Taylor admitted having been at the beach with a group of black youths and having seen a white man in his sixties there, and he identified three members of the group. When the assistant district attorney inquired concerning his obervations of the victim Barba, Taylor said he would refuse to answer the questions, and after a series of unresponsive answers from him it was moved by the Commonwealth that he be held in contempt. The judge then asked Taylor if he understood what was going on, to which he replied, "No." Thereupon the judge stated that he was going to be recognized as a material witness and he could "step down now and confer with counsel who has been appointed by the Court in the matter of contempt."

Taylor again appeared as a witness on December 11, 1973, subject at this time to subpoena and with counsel. Prior to any interrogation, Taylor's counsel advised the court that his client would decline to answer questions relating to the incident of October 4, 1973, "on the grounds that any answers might tend to incriminate him." Taylor thereafter refused to answer questions dealing with his activities and observations with respect to the afternoon of October 4, 1973. His testimony was then suspended and the detective who had questioned him on the evening of October 4, 1973, took the stand to relate the conversation he had with Taylor at that time. Taylor was recalled as a witness and, on refusing to answer the question, "Where did you go when you left your apartment?", was held in contempt.

The petitioner Funches's first appearance as a witness was on December 11, 1973, pursuant to a subpoena. He was accompanied by counsel. Following a few introductory questions which were answered, the prosecutor inquired further of Funches. Among the questions

asked of him was, "Directing your attention to October 4, 1973, did you stay in your apartment all day?" To this and other questions concerning his movements on the morning of October 4, 1973, Funches, on advice of counsel, declined to answer on the ground that such answers might tend to incriminate him. The ruling of the judge was that the answers to the questions could not possibly incriminate him, and when Funches persisted in his refusal to answer he was held in contempt.

Complaints were issued against both Taylor and Funches. They were both adjudged delinquent by reason of their refusal to answer and were then sentenced to sixty days with the Youth Service Board. In the Superior Court the two cases were heard together, the claims of privilege were sustained as to both petitioners, and the adjudications were set aside on that ground.

The right of a witness not to incriminate himself is secured by both the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Since the decision of the United States Supreme Court in *Malloy* v. *Hogan,* 378 U.S. 1 (1964), which held that the Fourteenth Amendment guarantees to a witness testifying in a State court the protection of the Fifth Amendment, we have applied Federal standards in determining whether a claim of privilege is justified. *Murphy* v. *Commonwealth,* 354 Mass. 81 (1968). *Commonwealth* v. *Baker,* 348 Mass. 60 (1964). Cf. *Gambale* v. *Commonwealth,* 355 Mass. 394, cert. denied, 396 U.S. 881 (1969). Under those standards a judgment of contempt against a witness for refusing to answer a question on Fifth Amendment grounds must be reversed unless it is "'*perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." *Malloy* v. *Hogan, supra* at 11-12. The privilege thus afforded extends not only to "answers that would in themselves support a conviction . . . but likewise em-

braces those which would furnish a link in the chain of evidence needed to prosecute. . . ." *Hoffman* v. *United States*, 341 U.S. 479, 486 (1951).

In this case Taylor had already told the police on October 4 of his meeting with a group of black youths on the day of the murder, of the talk of fighting whites, that the group had armed themselves with various implements and had proceeded in the direction of the beach, and that he was on the scene when the attack took place. The foregoing statements by Taylor do not make it possible to conclude that it was "perfectly clear" that the witness was incorrect in invoking the protection of the privilege. Furthermore, there were reportedly two additional violent attacks by two groups of young blacks in the Columbia Point area that day.[3] Taylor could well have concluded that testimony on his movements on October 4 would implicate him in these other crimes. Such a fear could not be considered fanciful.

In the case of Funches, Taylor's statement to the police had placed Funches near the place at the time of the murder. Funches lived at Columbia Point, a few minutes walk from the scene of the attack on Barba. Upon consideration of all the circumstances we agree with the Superior Court judge that it was not "perfectly clear" that answers to questions put to Funches concerning his movements on October 4, 1973, would not result in disclosure of information having a tendency to incriminate him.

The Commonwealth naturally is anxious to have the testimony of both of these witnesses but they are not required to assist the Commonwealth in building its case at the expense of incriminating themselves. This is not a

---

[3]Newspaper accounts of the October 4, 1973, incidents at Columbia Point were admitted at the Superior Court hearing on the petitions for writs of error challenging the contempt findings (The Boston Globe, Oct. 5, 1973; Boston Herald American, Oct. 5 and 6, 1973). See *Sandrelli* v. *Commonwealth,* 342 Mass. 129, 138-140 (1961); McCormick, Evidence § 139 at 293 (2d ed. 1972).

case where recalcitrant witnesses have been granted immunity and then continued to refuse to testify. See *Matter of DeSaulnier (No. 2)*, 360 Mass. 761 (1971). The Commonwealth has the burden of presenting a record on which it can be determined that there is no real possibility that the witness's answer will lead to disclosure injurious to him. *Murphy* v. *Commonwealth*, 354 Mass. 81, 84 (1968). That burden has not been met as to either of the petitioners.

The foregoing disposes of the case against Funches. The Commonwealth argues however that as to Taylor, even if he ordinarily would have been privileged not to answer the question, "Where did you go when you left your apartment?", that privilege was waived by his November 21, 1973, testimony. On that occasion he was sworn and testified that on the afternoon of the crime he went down to the beach with a group of black youths and saw one white male, in his sixties, at that location. It is claimed that by giving this incriminatory testimony, placing himself at the scene of the crime, Taylor waived the right to claim the privilege not to answer questions about his movements during the morning of that day. The principle is basically that "[d]isclosure of a fact waives the privilege as to details." *Rogers* v. *United States*, 340 U.S. 367, 373 (1951).

It has long been the law in Massachusetts that if an ordinary witness, not a party to a cause, voluntarily testifies to a fact of an incriminating nature he waives his privilege as to subsequent questions seeking related facts. *Commonwealth* v. *Pratt*, 126 Mass. 462 (1879). *Commonwealth* v. *Price*, 10 Gray 472 (1858). *Foster* v. *Pierce*, 11 Cush. 437 (1853). Cf. *Matter of DeSaulnier (No. 2)*, *supra*. This doctrine of "waiver by testimony" (which is recognized in some form in almost every jurisdiction in the United States, 8 J. Wigmore, Evidence § 2276 at 458 n.2 [McNaughton rev. 1961]) is not based on any true waiver theory at all in the usual sense of a voluntary, intelligent relinquishment of a known right.

In certain circumstances a witness who voluntarily an-
swers question X will be held to have waived his privilege
not to answer question Y regardless of the reasons which
may have impelled his original waiver. See *Common-
wealth* v. *Pratt, supra; Commonwealth* v. *Price, supra;*
8 J. Wigmore, *supra* § 2276 at 456; McCormick, Evi-
dence § 140 at 296-298 (2d ed. 1972); Note, Waiver of
the Privilege Against Self Incrimination, 14 Stan L. Rev.
811 (1962). The rationale most frequently advanced for
this result is that when a witness has freely testified as to
incriminating facts, continued testimony as to details
would no longer tend to incriminate. Requiring further
disclosures in this context does not significantly endanger
the interests which the privilege protects. *Rogers* v.
*United States, supra* at 374-375. McCormick, *supra*
§ 140 at 296.

A second concern often expressed is that allowing the
testimony to remain in a witness-selected posture would
result in serious, unjust distortion; and the witness,
having chosen to answer when he could have remained
silent, "cannot be allowed to state such facts only as he
pleases to state, and to withhold other facts." *Common-
wealth* v. *Price, supra* at 476. 8 J. Wigmore, *supra*
§ 2276 at 456.

The fact nuances which ofttimes make the application
of the principles of the rule difficult are not present here,
for the initial testimony (which brings about the waiver)
is to be freely and voluntarily given before a subsequent
forfeiture of the privilege can be found. *Commonwealth*
v. *Pratt, supra. Commonwealth* v. *Price, supra. Rogers*
v. *United States, supra.* 8 J. Wigmore, *supra* § 2276 at
456. We conclude that Taylor's testimony on Novem-
ber 21, 1973, was not freely and voluntarily given and
that it was open to him, therefore, to claim the privilege
when he regained the stand on December 11, 1973.

Certainly his statements to the police on the night of
October 4, 1973, did not constitute a waiver extending
to the later trial. It is the majority rule that waiver by

testimony is limited to the proceeding in which it is given and does not extend to subsequent proceedings. 8 J. Wigmore, *supra* § 2276 at 458 (1961, Supp. 1975). *McCormick, supra* § 140 at 298-299. See, e.g., *United States* v. *Johnson,* 488 F.2d 1206, 1210 (1st Cir. 1973); *United States* v. *Miranti,* 253 F.2d 135, 139 (2d Cir. 1958); *In re Neff,* 206 F.2d 149, 152 (3d Cir. 1953). See also *People* v. *Walker,* 28 Ill. 2d 585, 588-589 (1963); *State* v. *Decola,* 33 N.J. 335, 345-349 (1960); *Snyder Appeal,* 398 Pa. 237, 242-246 (1960).

It is true that in *Matter of DeSaulnier (No. 2), supra,* this court, in dicta, indicated that we would be inclined not to follow the majority rule and under certain conditions to adopt the minority "continuing waiver" theory as laid down in *Ellis* v. *United States,* 416 F.2d 791, 800-803 (D. C. Cir. 1969) (waiver of nonindicted witness before grand jury held to extend to trial of indictment returned). However, even the "continuing waiver" theory applies only to prior testimony, to which description Taylor's unsworn statements given to the police at the station house in Dorchester do not answer. Whatever the exact dimensions of the rule we adopt, when actually confronted with a witness who wishes to invoke the privilege as to testimony he has already given in a prior proceeding, we hold that statements given to police officers in the ordinary course of an investigation do not result in a waiver of the privilege as to subsequent in-court, under-oath testimony. Therefore Taylor's statements to the police do not affect his right to claim the privilege at trial on December 11, 1973.

Returning to Taylor's appearance in court on November 21, 1973, it is to be remembered that he was sixteen years of age and appeared alone, without parents and counsel. He displayed much reluctance and hesitancy in responding to questions put to him by the assistant district attorney, frequently answering, "I don't know," or, "I don't have an answer." He eventually refused to answer questions concerning his observations of the

victim Barba at a time and place closely related to the stabbing, persisting in this refusal after threats of contempt. At the conclusion of his November 21, 1973, testimony, in response to a question of the District Court judge, "Do you understand what is going on?", Taylor replied, "No."

Furthermore, Taylor received no help from the judge to the effect that he need not answer questions tending to incriminate him. While such intervention on behalf of a witness is not required in this Commonwealth, we have made it clear that in certain circumstances, where the witness is ignorant, misinformed or confused about his rights, and there is danger to him in the testimony sought to be elicited, it is a "commendable practice" for the judge to intervene and advise the witness. *Commonwealth* v. *Slaney*, 345 Mass. 135, 142 (1962). *Mayo* v. *Mayo*, 119 Mass. 290, 292 (1876). See J. Maguire, Evidence of Guilt § 2.07 at 65, n.1 (1959): "There has been some difference of opinion as to whether a judge or other presiding official must inform a witness of his privilege, in order to make acquiescence [with a demand for disclosure of self-incriminating information] truly voluntary. Such cautionary action seems to have become largely discretionary, but ignorance, confusion, or panic on the part of the witness, or other peculiar circumstances, may make the caution mandatory. 8 Wigmore, Evidence § 2269 (3d ed. 1940)." Special caution is indicated where a juvenile witness is involved, particularly one appearing without counsel, parents or anyone else who might advise and guide him, to ensure that his rights do not become forfeit through fear, confusion or intimidation. See *In re Gault*, 387 U.S. 1, 45 (1967). Cf. *Commonwealth* v. *Daniels*, 366 Mass. 601, 605-606 (1975); *Commonwealth* v. *Cain*, 361 Mass. 224, 227-229 (1972). Taylor's answers at the time seem to us to demonstrate distress in the face of his realization that he had provided vital information to the police. These responses might also indicate a misunderstanding on his part that

by giving such statements to the police he had lost the right to refuse to provide similar incriminating testimony as a witness.

We would conclude, testing the circumstances, that Taylor's testimony on November 21, 1973, was not so freely and voluntarily given as to effect a waiver of his privilege on later questioning. When he appeared as a witness on December 11, 1973, that privilege was available to him and, as we have decided earlier, he properly invoked it. In the light of the foregoing we do not treat other questions which have been raised. The exceptions of the Commonwealth are overruled.

*So ordered.*