COMMONWEALTH *vs.* EDWARD R. VOISINE, THIRD.

Plymouth. March 1, 1993. - April 8, 1993.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Evidence,* Relevancy and materiality, Cross-examination. *Search and Seizure,* Consent. *Witness,* Privilege, Self-incrimination, Bias.

At a murder trial, the defendant's blood-spattered hat was correctly admitted in evidence as relevant to whether the defendant was present at the scene of the murder [781-782], and the failure of the Commonwealth to conduct a blood-grouping analysis to determine whether the blood on the hat was that of the victim was an issue for the jury to weigh and not a ground for exclusion of the hat [782].

In a criminal case in which the defendant sought to suppress evidence seized from him at the time he was arrested, the judge correctly determined that the police had made a warrantless entry into the apartment where the defendant was found with the voluntary consent of the tenant who leased the premises. [782-783]

At a criminal trial the judge correctly concluded that a prosecution witness had not waived his privilege against self-incrimination by pleading guilty to crimes related to those for which the defendant was being tried. [783-785]

At the trial of a murder case, error, if any, in the judge's instructions with respect to a witness's assertion of her privilege against self-incrimination and a subsequent grant of immunity to that witness, did not create a substantial likelihood of a miscarriage of justice, where the witness's credibility was attacked on numerous grounds, the issue of invocation of the privilege and the grant of immunity was clearly before the jury, and the judge gave full instructions concerning the credibility of witnesses. [785-787]

INDICTMENTS found and returned in the Superior Court Department on April 11, 1988.

A pretrial motion to suppress evidence was heard by *Barbara J. Rouse,* J., and the case was tried before *J. Harold Flannery,* J.

*John B. Glynn* for the defendant.

*Frank M. Gaziano,* Assistant District Attorney, for the Commonwealth.

NOLAN, J. A jury found the defendant guilty of murder in the first degree, burglary, larceny in a building, larceny of a motor vehicle, and burning of a motor vehicle. On appeal, the defendant advances four arguments claiming error. We reject the defendant's arguments and affirm the convictions. We also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E (1990 ed.), to direct the entry of a verdict of a lesser degree of guilt, or to order a new trial in connection with the murder conviction.

On Monday, March 14, 1988, at approximately 9 P.M., as he was leaving work, an employee of the United Parcel Service in Brockton heard a "poof" and saw an automobile on fire and two people running from it. The Brockton police and fire departments responded to a call concerning a burning motor vehicle. Officer Thomas Keating ascertained the identification number of the vehicle and determined that it was registered to the victim at a Whitman address.

The next day, a Whitman police officer called the victim's mother. The officer asked her where he could reach her son. When asked why he was inquiring, the officer told her that a burned automobile registered to her son had been found.

In response, she left her office and went to her son's condominium which was located nearby.[1] When she arrived she noticed her son's automobile was not parked in its usual spot. She approached the front door of the condominium unit and found that it was unlocked. She entered the living room and found it in disarray. The condition of the condominium surprised her because she knew the victim to be meticulous. The victim's mother ascended the stairs to the second floor. She observed a hammer in the bathroom sink, she then went into the rear bedroom where she saw her son lying on his right

---

[1]The victim had a seasonal job as a golf course manager. As his seasonal duties had not yet commenced, the mother expected her son to be at home.

side, covered with a bedspread. She removed the bedspread and discovered the victim's body.

The victim's mother telephoned the Whitman fire department. The first fire fighter on the scene confirmed that the victim was dead. He later testified that the wall behind the victim's bed was splattered with blood. Thereafter, Whitman police arrived. The investigating officers suspected that the hammer, which the victim's mother had observed in the bathroom sink, was the murder weapon. Laboratory analysis later revealed that the hammer had human blood and hair on its maul face. The hair matched that of the victim.

Dr. John C. DuVale performed an autopsy on March 15, 1988, and testified that he observed numerous injuries to the victim's head. The injuries consisted of six round lacerations to the left side of the head and one laceration to the top of the head. The lacerations were semi-lunar or quarter-moon shaped. Dr. DuVale testified that the cause of death was blunt trauma to the head. He also testified that the injuries were consistent with those that could have been caused by the hammer. Dr. DuVale testified that the injuries caused considerable bleeding.

Jay Godleski, a senior chemist with the Department of Public Safety, investigated the scene. Godleski, who testified as an expert in the field of blood stain analysis, observed more than 600 "directional spatters" in the victim's bedroom. The blood stains were shaped like teardrops with the point of the drop indicating the path of travel. The stains were found on the walls, bedroom furniture, and the headboard of the bed indicating that the victim had been struck while in bed. Several stains were found four to five feet from the body.

Investigating officers also found a bag, wrappings, and packaging of food from a Burger King restaurant in the living room. A sales receipt in the bag indicated that the food was purchased on March 13, 1988, at about 10:30 P.M. There was no evidence of forced entry into the victim's condominium unit. Members of the victim's family reported that some of his possessions and clothing were missing.

On March 20, 1988, the chief of the Whitman police department, John Schnyer, received a telephone call from the Hanson police department concerning information which might assist the Whitman police in their investigation of the victim's death. That evening, two Hanson officers met with Chief Schnyer. The officers knew of a woman who had information about the murder; they telephoned her and the woman gave them information linking one Paula Studinski to the murder. Because Paula Studinski's father was a lieutenant with the Brockton police department, Whitman police officers informed him of the events and asked whether he wanted to be present when police interviewed his daughter. Lieutenant Studinski did want to be present.

Shortly after midnight, Chief Schnyer, Lt. Studinski, and several other officers went to Paula Studinski's apartment in Brockton. When they arrived Paula Studinski first spoke privately with her father and then allowed the officers into her apartment. Once in the apartment, officers found some of the items reported missing from the victim's condominium. Investigating officers also recovered a white hat covered with reddish-brown stains in Paula Studinski's bedroom. Paula Studinski accompanied police to the Brockton police station where she gave a statement implicating the defendant. Paula said that in a series of three telephone calls she received in the early hours of March 13, 1988, the defendant stated he wanted to kill someone, and in a later call told Paula he had done it. Paula Studinski told police that the defendant came to her apartment that morning, and brought several items belonging to the victim with him.

Studinski reported that she had been living with the defendant until either March 7 or March 8. She also told police that the defendant was dating Rachel Barkley, and suggested that they might find him at Barkley's residence in Brockton.

Shortly after Paula Studinski gave police her statement, police interviewed Corey Bunch. Bunch was a roommate of Paula Studinski, but was not at home on the night of March 20, 1988. Bunch told police that he had accompanied the defendant to the victim's condominium on Sunday afternoon,

March 13, 1988, to steal items from the victim's condominium. The defendant showed Bunch the victim's body and then asked for Bunch's assistance in removing television sets and other items. Bunch was also present when the defendant burned the victim's automobile. Bunch also suggested that the police question Barkley as to the defendant's whereabouts. The police learned that there were several default warrants issued against the defendant by the Brockton District Court. The police did not obtain another warrant for the defendant's arrest nor did they obtain a search warrant for Rachel Barkley's apartment.

At approximately 8:30 A.M. on March 21, 1988, five or six police officers approached Barkley's apartment with their weapons drawn, knocked on the door, and announced "police." Barkley opened the door. The officers told her they were looking for the defendant and asked if she knew where he was. Barkley pointed in the direction of the bedroom. The police never presented a warrant. Barkley testified at the hearing on the defendant's motions to suppress and to dismiss that she knew that she did not have to let the police into her apartment that morning.

The police found the defendant on the floor hiding under a comforter. He was wearing a high school class ring and a watch later identified as belonging to the victim. The defendant was arrested for the victim's murder.

At trial, Paula Studinski testified under a grant of immunity. She testified that she had met the defendant in February, 1986, and started dating him in April of that year. Studinski testified that she moved into an apartment in Brockton occupied by her father in July, 1987. Lieutenant Studinski testified that he moved out of the apartment in October, 1987, and that Paula was not seeing the defendant while Studinski was living with his daughter. Paula testified that her parents did not approve of her relationship with the defendant.

After her father moved out, Paula Studinski testified that the defendant and one Divana Smith moved into the apartment. In December, 1987, Corey Bunch moved in. Paula said

that the defendant moved out of the apartment at her request on March 7 or March 8. Paula next heard from him during the early morning hours of March 13, 1988.

On Saturday night, March 12, 1988, Paula Studinski was home socializing with friends. Paula testified that the telephone rang at approximately 1 A.M. She testified that it was the defendant. She asked the defendant where he was. Paula testified that the defendant replied, "In Whitman, at this guy's house." Paula testified that the defendant next told her that "he wanted to kill someone." Paula asked why. She testified that the defendant responded, "Because I feel like I am being set up." Paula told the defendant that it was not right. Paula testified that the defendant concluded the conversation by stating, "I love you, and I'll call you when its done."

The telephone rang a second time forty-five minutes later. Paula testified that it was again the defendant who said, "It's done." Paula testified that, when she asked, "What," the defendant repeated, "It's done. I did it." Paula said the defendant then asked whether he could visit her. Paula said no and hung up the telephone. Paula testified that the defendant telephoned a third time ten minutes after the second call. The defendant said he had been drinking and wanted to visit her. Paula acquiesced and asked him how he was going to get to her apartment. The defendant responded, "I'll take the car."

One of Paula's guests corroborated Paula Studinski's recounting of these events. On direct examination, the guest testified that she had known the defendant since June, 1986, and that Paula Studinski was her best friend. She also said that she had had a relationship with the defendant and that they had a child together. Paula testified that the defendant arrived at her apartment at about 5 A.M. on March 13, 1988. When he arrived Paula said he was carrying a grocery bag and a portable radio.

Later that day, at around noon, Paula awoke. She testified that the defendant asked her if she wanted to see what he had brought. Paula testified that the defendant showed her the contents of the bag which included a number of compact discs, a wallet holding a driver's license in the name of the

victim, and an envelope containing coins. Paula testified that the defendant told her he had obtained these items from the "house he had been at the night before."

Paula examined the items and then asked if the defendant was sure the man was dead. The defendant responded, "No, I am not sure, but if he wasn't then, he is now." After some hesitation, the defendant told Paula that he had used a hammer to kill the victim.

Paula testified that after the defendant placed a telephone call to Corey Bunch, he said he had to get some things from the automobile, and she went outside to hold open the door. She observed him taking articles of clothing out of a new red automobile.[2] He carried the clothes into her bedroom. The items included jackets, sweaters, jeans, and one pair of shoes. The items were identified at trial as belonging to the victim. After unloading the car, at approximately 2 P.M., the defendant left to meet Corey Bunch.

Paula testified that the defendant returned later that afternoon. He was accompanied by Corey Bunch and one Chris Murray. The three men planned an evening of dancing and entertainment. The defendant and Bunch dressed in the victim's clothes. Before he left, the defendant realized that he had left his hat at the Whitman condominium. Paula testified that the defendant said, "Oh, shit, I left my hat there." Paula had given the hat to the defendant as a Christmas present. It was a white baseball cap that bore the letters "S I K E" on the front of the hat. The three left the apartment at 7:30 P.M. intending to visit a dance club. They departed in the victim's automobile. The defendant drove. On route, the defendant stopped at the victim's condominium. Chris Murray, who had known Corey Bunch for more than four years, and thought himself a good friend, testified that the defendant brought the hat out of the condominium. After retrieving the hat, the three proceeded to the dance hall.

---

[2]The defendant had not previously owned an automobile. The victim had recently purchased a new red Oldsmobile automobile in February, 1988.

After an hour, the defendant, Bunch, and Murray left the dance and went to a Burger King restaurant in Hanover. Chris Murray said he left the defendant and Bunch after arriving at the restaurant. Murray said he received a ride home from another person and did not see the defendant and Bunch after they reached the restaurant.

At approximately 10:30 P.M., the defendant and Corey Bunch purchased food at Burger King and drove to the victim's condominium. After arriving, the defendant and Bunch ate their food and moved items from the condominium to the automobile. They left the wrappings and packaging from their meal in the victim's living room. Fingerprint analysis later conducted on the refuse revealed two latent fingerprints. A police analyst identified one fingerprint as the defendant's and one as that of Corey Bunch.

Paula testified that Bunch and the defendant returned to her apartment at 11:30 P.M. They carried the items they had removed from the victim's condominium into the apartment. The items included two television sets, a clock radio, an antique clock, a telephone, and a bag of clothing. Paula testified that she had discussed the automobile with the defendant. Paula said that he indicated that he needed "to get rid of it." On March 14, 1988, at 7:30 P.M., Corey Bunch visited one Greg Hodges to enlist his assistance to burn the automobile. Hodges testified that the defendant previously had told him that the car belonged to Rachel Barkley. Hodges testified that Bunch said that he and the defendant were going to burn the car and they needed a ride home.[3] Hodges agreed to help. Hodges drove to the appointed location. After the defendant and Bunch ignited the automobile they ran to Hodges' waiting automobile. Hodges then drove them to Paula's apartment.

Paula testified to the events of Wednesday, March 16, 1988. When she came home from work the defendant and

---

[3]At the time of trial, Hodges testified that he stood charged with the burning of a motor vehicle. Hodges testified that he had agreed to testify truthfully in return for dismissal of the charge against him.

Bunch were lifting weights. She testified that she heard the defendant say to Bunch that "the weight lifting must really be working. . . . [B]ecause . . . [the] first time he brought the hammer down it went right through his skull." On the same night Paula showed the defendant a newspaper account of the murder. The defendant said the newspaper account was wrong because he left the hammer in the sink, not next to the bed as the newspaper reported, and he hit the victim three, not seven, times, contrary to the newspaper account. Paula testified that she did not discuss the murder with the defendant after March 16, 1988.

The Commonwealth introduced testimony concerning Corey Bunch's whereabouts on the evening of March 12-13. David Baker testified that he picked up Bunch at his girl friend's apartment around 7:30 P.M. on March 12, and went to a "dance club," the Car Palace, with him. Baker testified that he dropped Bunch off at his girl friend's house at 1:45 on the morning of March 13. During cross-examination Baker testified that his dislike for the defendant was well known.[4]

Jeanette Maitland, Corey Bunch's girl friend, testified and corroborated David Baker's story as it pertained to Corey Bunch's whereabouts on the evening of March 12 and the early morning hours of March 13, 1988. She also testified that the defendant called Bunch at her apartment around noon on March 13 and picked up Bunch later that afternoon in front of her apartment.

Rachel Barkley testified that she met the defendant in May, 1987. She said that they had a brief relationship, which resumed in March, 1988. Barkley testified that the defendant "moved in" with her on March 4, 1988. On March 12, 1988, the defendant left her apartment at 9 P.M. after an argument. Barkley testified that he visited during the week of March 13, 1988, and returned on the evening of March 20,

---

[4]Baker testified that he was charged with receiving stolen property — Corey Bunch had given or sold Baker one of the victim's television sets. Baker testified that he was convicted and sentenced to one year of probation and a suspended one-year sentence in return for his testimony.

1988. Barkley testified that she noticed that the defendant was wearing a new ring when he returned.

In his defense, the defendant tried to implicate Corey Bunch. The defendant called one Kenneth Baily, who testified that he had attended the Car Palace on the evening of March 12, 1988, the same club Corey Bunch allegedly attended. Baily testified that there were approximately 150 patrons in the club that night. Baily testified he had known Bunch for about one year but did not see him at the Car Palace that night. On direct examination, Baily testified that he had been the defendant's "roommate" while incarcerated in a house of correction.

We now examine the issues raised on appeal by the defendant.

1. *The hat.* After jury empanelment, the defendant filed a motion in limine seeking to prevent the Commonwealth's expert from testifying that the reddish-brown stains found on the defendant's hat were human blood. The defendant objected because the Commonwealth failed to conduct blood-grouping analysis to prove that the blood on the hat was that of the victim and not that of the defendant. The judge denied the motion, and the defendant appeals. The defendant argues that the testimony was irrelevant and unduly prejudicial. We disagree.

"In order to be considered admissible, evidence 'need not establish directly the proposition sought; it must only provide a link in the chain of proof.'" *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 744 (1990), quoting *Commonwealth* v. *Tobin,* 392 Mass. 604, 613 (1984). The testimony was relevant to the issue whether the defendant was at the scene at the time of the murder, and ultimately whether the defendant was the perpetrator.

The Commonwealth's expert testified that the trauma the perpetrator inflicted on the victim caused severe bleeding and blood splattering. Investigators found more than 600 directional blood splatters on the walls and furniture in the victim's bedroom, some more than four feet from the victim's body. The defendant, according to two witnesses, said that he

left his hat in the victim's condominium on March 12, 1988, the last day the victim was seen alive. Further, the Commonwealth's expert testified that twenty-five reddish-brown stains were found on the hat, many of which were located on the underside of the hat's brim.

The defendant argues, nonetheless, that admission of the testimony without proof that the blood was that of the victim was overly prejudicial. We disagree. "Evidence is not rendered prejudicial merely because it is inconclusive. It is axiomatic that it is for the jury to determine the probative value to be accorded relevant evidence." *Id.* at 745, quoting *Commonwealth* v. *Benoit*, 382 Mass. 210, 221 (1981). The defendant's arguments go to the weight, not the admissibility, of the evidence, "and it is for the jury to determine — after listening to cross-examination and the closing arguments of counsel — what significance, if any, they will attach" to the human blood on the defendant's hat. *Id.*

2. *The defendant's arrest.* Police arrested the defendant at Rachel Barkley's residence on the morning of March 21, 1988. The police learned of the defendant's whereabouts from two witnesses, Paula Studinski and Corey Bunch. After arresting the defendant, police seized a ring, a wallet, and a watch from him, all of which belonged to the victim. Prior to trial, the defendant moved to suppress all this evidence on the ground that the warrantless arrest and search were unlawfully conducted. After an evidentiary hearing, the motion judge denied the motion. We affirm the motion judge's decision.

Of the possible justifications for the warrantless arrest and seizure, we need consider only one, consent. At the threshold, we note that the defendant was an overnight guest in Rachel Barkley's apartment, having stayed with her two or three times between March 1, 1988, and the day of the defendant's arrest. The defendant did not contribute to Barkley's rent payment and kept only a few items of clothing at her apartment. We are faced with a preliminary question concerning the defendant's standing to challenge the warrantless entry into Barkley's house. For the purpose of analysis only, we

shall assume that the defendant has standing. See *Minnesota v. Olson*, 495 U.S. 91 (1990).

We turn now to the merits of the defendant's challenge. As the motion judge noted in her memorandum of decision, "Police may not make a warrantless entry into the home of a third person to arrest a suspect or to search for or seize evidence, absent exigent circumstances or consent." *Commonwealth v. Derosia*, 402 Mass. 284, 286, cert. denied, 488 U.S. 980 (1988). As the premises were leased to Barkley, she had authority to give valid consent. When consent is the basis for a warrantless entry, the Commonwealth must show "consent unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth v. Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976), quoting *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968).

At the motion hearing, Barkley testified that she knew that she did not have to let the police into her apartment, but chose to do so anyway. The fact that Barkley communicated her consent by pointing in the direction of the bedroom where the defendant was hiding, rather than by speaking is of no effect. See generally *Commonwealth v. Maloney*, 399 Mass. 785, 787 (1987). The voluntariness of an individual's consent is a question of fact, *Commonwealth v. Aguiar*, 370 Mass. 490, 496 (1976). In the present case, the judge's decision was without taint of error given the circumstances.

3. *Corey Bunch's testimony*. The defense sought to implicate Corey Bunch as the murderer. On the final day of the trial, the defense sought to call Corey Bunch as a witness. Nine months prior to trial Bunch pleaded guilty as an accessory after the fact to murder, burglary, larceny in a building, receiving stolen property, and the burning of a motor vehicle. At a sidebar conference, the prosecutor anticipated that Bunch would invoke his privilege against self-incrimination when called to testify. He requested a voir dire with the witness outside the presence of the jury. See *Commonwealth v. Hesketh*, 386 Mass. 153, 155 (1982).

Bunch was represented by counsel at the voir dire. When questioned, Bunch asserted his privilege against self-incrimination. The judge accepted Bunch's assertion of the privilege but ordered Bunch to answer questions regarding his height, weight, name, age, and address. Further, the judge allowed Bunch to stand beside the defendant so that the jury could view their difference in size — the point being that Bunch was bigger and therefore more likely to have possessed the required strength to deliver the blows.

On appeal, the defendant argues for the first time that Bunch waived his privilege against self-incrimination under the Fifth Amendment to the United States Constitution by pleading guilty to related crimes. The defendant argues that Bunch should not have been allowed to invoke his Fifth Amendment right as to his involvement in the murder and his whereabouts on the evening of March 12-13, 1988. There was no error.

"It has long been the law in Massachusetts that if an ordinary witness, not a party to a cause, voluntarily testifies to a fact of an incriminating nature he waives his privilege [against self-incrimination] as to subsequent questions seeking related facts." *Taylor* v. *Commonwealth*, 369 Mass. 183, 189 (1975). "This doctrine of 'waiver by testimony' is not based on any true waiver theory at all in the usual sense of a voluntary, intelligent relinquishment of a known right." *Id.* "The rationale most frequently advanced for this [doctrine] is that when a witness has freely testified as to incriminating facts, continued testimony as to details would no longer tend to incriminate. Requiring further disclosures in this context does not significantly endanger the interests which the privilege protects." *Id.* at 190.

The defendant would have us equate Bunch's guilty pleas with testimony for the purposes of determining waiver of the privilege. This is a step we are not prepared to take.

The defendant's argument rests on the assumption that Bunch could not incriminate himself because he had pleaded guilty to the crimes charged. It cannot be said that Bunch's testimony would not "furnish a link in the chain of evidence

needed to prosecute the claimant," on an additional charge as a principal to murder in the first degree. *Commonwealth* v. *Borans*, 388 Mass. 453, 456 (1983), quoting *Hoffman* v. *United States*, 341 U.S. 479, 486 (1951). "[A] witness does not lose his Fifth Amendment right to refuse to testify concerning *other* matters or transactions not included in his conviction" (emphasis in original). *Commonwealth* v. *Borans*, *supra* at 459. We conclude that Corey Bunch's guilty pleas did not rise to the level of testimony for determining whether he waived the privilege. Accordingly, the defendant's argument fails. We hold that the judge properly construed the privilege in favor of the claimant. See *id.* at 455.

4. *Cross-examination of Paula Studinski.* During cross-examination of Paula Studinski, defense counsel attempted to show bias by revealing that Paula had claimed the Fifth Amendment privilege during the grand jury proceedings and had refused to testify prior to the Commonwealth's grant of immunity. The judge allowed the inquiry but then instructed the jury: "Now, members of the jury, I instruct you as a matter of law, the assertion of a Constitutional right is the prerogative and the right of every citizen. An assertion of such right is not to be held against the person asserting that right in any respect." The judge continued, "I further advise you on direct examination the witness was asked and testified about a grant of immunity [the] prosecution afforded her. It's . . . also the law of the Commonwealth, that as the basis or predicate for a grant of immunity, a witness is obliged to assert her privilege against self-incrimination." The judge did not repeat the instruction to the jury while charging them after final arguments.

It is axiomatic that a criminal defendant is entitled to cross-examine a witness to show bias or inducement to testify. See P.J. Liacos, Massachusetts Evidence 145 (5th ed. 1981). In some cases, circumstances are present that make a witness's invocation of the privilege and subsequent grant of immunity ripe for impeachment purposes. In certain circumstances, invocation of the privilege and a subsequent grant of immunity or promise of leniency by the government bear di-

rectly on the witness's credibility. See *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979); *United States* v. *Kaplan*, 832 F.2d 676, 684 (1st Cir. 1987), cert. denied, 485 U.S. 907 (1988). Even if we assume without deciding that such circumstances were present in this case and that, therefore, the judge erred in instructing the jury that they should not draw an adverse inference from the witness's invocation of the privilege, we hold that the error did not create a substantial likelihood of a miscarriage of justice. We rest our holding on three considerations.

First, the record reveals that defense counsel repeatedly attacked Paula Studinski's trustworthiness, reliability, and credibility on numerous grounds. The defense suggested that Studinski had motive to fabricate because the defendant was now involved with another woman. The defense suggested that Paula's testimony was the product of prompting by her father, who did not approve of her relationship with the defendant. The defense even hinted at a possible relationship between Corey Bunch and Studinski giving rise to the inference that her testimony was the product of a conspiracy.

Second, the evidence concerning Paula's invocation of the privilege and the Commonwealth's subsequent grant of immunity was clearly before the jury. During closing argument the defense counsel reprised the subject at issue: "On April 4th, 1988, she's called before the grand jury, and all of a sudden Paula takes . . . the Fifth Amendment, she buttoned up because she could still be exposed, and all of a sudden Daddy comes to her aid, again escorts her into the Supreme Judicial Court in downtown Boston . . . and she gets immunity. Now, she comes back April 11, 1988. She's not under duress now; she's gotten immunity, and immunity basically means if we think you lie you could get hooked for perjury."

The final fact supporting our conclusion pertains to the judge's charge to the jury concerning the credibility of witnesses. In his charge to the jury, the judge said: "Now, among your other responsibilities is evaluating the credibility of witnesses as you decide disputed questions. You should give the testimony of each witness whatever degree of belief

and importance that you judge it's fairly entitled to receive. You are the sole judge of the credibility of witnesses, and if there are conflicts in the testimony, it's your function to resolve those conflicts and to determine where the truth lies. . . . In deciding whether to believe a witness and how much importance to give a witness's testimony you must look at all the evidence . . . . [Y]ou may consider the witness's motive for testifying, whether she or he displays any bias in testifying."

5. *G. L. c. 278, § 33E.* We have reviewed the record and conclude that the defendant's conviction for murder in the first degree deserves to stand.

*Judgments affirmed.*