Hely, J.
I. Introduction
Each defendant is charged with trafficking in cocaine, 200 grams or more. The defendant Pagan has moved to suppress the pair of kilogram cocaine bricks found in his backpack. Pagan’s motion also seeks suppression of his statements to the police, claiming that the statements were the fruit of an unlawful search. At the motion hearing Pagan waived any claim that his statements were involuntary or obtained in violation of his Miranda rights.
The defendant Cepeda moved to join in Pagan’s motion. Cepeda’s motion will be treated as a motion to suppress. Both defendants’ motions are denied because the police were acting lawfully when they opened Pagan’s backpack and cut into the drug bricks.
The court finds that the testimony of Officers Randolph and Coady was truthful and accurate on all material points. The court’s findings are based on the testimony, the exhibits, and the reasonable inferences that the court has drawn from the evidence.[1]
II. Facts
A resident of 425 West Elm Street called the Brockton Police station and reported that there was a breaking and entering in progress at that address. The date was April 11, 1999. The time was 11:30p.m. The call came in on the 911 line. The resident reported that two Hispanic males were trying to break into the front windows. One was wearing a bulky jacket and the other had a large bag in his hand. This information was relayed by radio to Officers Antonio Randolph and James Coady.
The officers drove immediately to the address. 425 West Elm Street is a three story apartment building, part of a complex of similar buildings. There are four or five apartments on each floor. The officers knew that the Brockton Police frequently received calls and made arrests in this building and in the vicinity for offenses such as assaults, domestic violence and weapons and drug violations.
When the officers arrived, they saw no one in front of the building. They entered the front security door by pushing the residents’ buzzers until someone buzzed them in. Officer Randolph went up the common stairway and saw a black nylon gym bag on the second floor near the stairway. He thought this might be the bag reported to have been held by one of the burglars. He then saw the defendant Angel Pagan sitting on the stairway between the second and third floors. Mr. Pagan is an Hispanic male. He had a backpack on his back.
Officer Randolph reasonably suspected from all the circumstances that he was confronting one of the two men who had been seen trying to break into the front windows. He instructed Mr. Pagan to stand up. Mr. Pagan is six feet tall and weighs 225 pounds. Because of the frequency of crime in the neighborhood, the nature of the report and all the circumstances, Officer Randolph decided to question the defendant and to conduct a pat-frisk of his person and his backpack for weapons. He reasonably feared that the defendant might have on his person or in the backpack either a weapon or a burglary tool or instrument that could be used as a weapon. He instructed the defendant to take off his backpack, and he helped him do so. Officer Coady came up to this location on the stairway at about this time.
Officer Randolph pat-frisked the defendant for weapons and found none. He asked the defendant for identification. The defendant said that he was a police officer in Puerto Rico. The defendant and Officer Randolph spoke to one another in English. Officer Randolph again asked the defendant for identification, saying that if he was a police officer he should have some identification. The defendant replied that his identification was in the backpack and he pointed to the backpack.
Officer Coady opened the large main compartment of the backpack and looked inside. He saw a hard, heavy brick-shaped object wrapped in silver-gray duct tape. He took it out. Based on his military experience and training, Officer Coady’s first thought was that this was a bomb. He said, “What is this, a bomb?” The defendant did not reply. Officer Coady then saw that there was a second duct-taped wrapped brick in the backpack immediately under the first one. He took out the second brick. It was identical to the first.
Each brick was about eight inches by four inches by two inches. They were oblong shaped, but their corners and edges were rounded. The duct tape en *516 tirely covered all the surfaces of the bricks. By feel, Officer Coady thought their combined weight was about six pounds.
Officer Randolph and Officer Coady had been police officers for about two and a half years. They had each participated as uniformed officers in dozens of previous drug arrests and investigations. The City of Brockton provides plenty of opportunity for such experience. Both officers had attended several training programs on illegal drugs. The training covered common methods of packaging, transporting and distributing illegal drugs. In their training, both officers had seen photographs and demonstrations of bricks of drugs that were identical to the bricks from the backpack in size and in their duct tape wrappings. Officer Coady had actually handled a duct tape wrapped drug brick in his training that had the exact same outward appearance, size and feel.
When Officer Coady took the bricks out and the defendant did not respond to his bomb question, he remembered handling an identical drug brick in his training. He had never seen anything like these bricks except the drug bricks shown to him in his police training. When Officer Randolph saw the bricks from the backpack, he immediately thought they were kilograms of cocaine. Officer Randolph told Officer Coady that he thought the bricks were drugs. Officer Coady agreed.
Officer Randolph gave Officer Coady a pocket knife. He told him to cut into the bricks to confirm that they were drugs. Officer Coady made a one and a half inch cut into the first brick. With this cut he could see under the duct tape a layer of Vicks Vapo-Rub, a thin layer of clear, tinted plastic wrap, and a solid brick of a white substance that had all the appearances of cocaine. The officers knew from their training that drug dealers sometimes use Vapo-Rub and similar substances in their packaging to keep police dogs from smelling the drugs. Officer Coady made a similar cut in the second brick and saw the same thing.
The officers arrested Mr. Pagan for possessing the cocaine. At the bottom of his backpack, they found his wallet and identification. During the course of the arrest, the officers looked into the black gym bag that someone had left on the floor near the stairs. It contained nothing of evidentiary significance, and they left it there, Mr. Pagan told the officers that the gym bag belonged to his friend who had gone to use a telephone.
At the police station, Mr. Pagan said that he and Jose Cepada had taken a bus from White Plains, New York, to Boston and a taxi to Brockton. He said that Cepeda’s sister lived in Brockton and that Cepeda had gone to call his sister before the officers arrived. Further police investigation revealed that at some time after the officers left with Pagan, Cepeda returned to the apartment building and retrieved his gym bag. Mr. Cepeda was arrested in Boston about four hours later.
III. Additional Fact Findings and Rulings
Officer Coady’s opening of Mr. Pagan’s backpack was lawful as part of a threshold inquiry weapons search of the area within the suspect’s immediate access. The officers had discovered the defendant late at night on the apartment stairway while they were investigating a fresh report of a break-in in progress. Crimes, including crimes involving weapons, were frequent in the area. The defendant Pagan’s location and appearance and the presence of a large bag were all consistent with the break-in report. The backpack he was wearing weighed about six pounds, and it could easily contain a weapon or a burglary tool that could be used as a weapon. A second burglar was believed to be in the area, and this added to the risk facing the officers. For their own safety they were permitted to open the backpack to assure themselves that there were no weapons present. This was within the lawful scope of a Terry threshold inquiry weapons search. Commonwealth v. Almeida, 373 Mass. 266, 270-72 (1977) (Terry weapons search included car’s interior after suspect taken out of the car); Commonwealth v. Vasquez, 426 Mass. 99, 102-03 (1997).
The officers also believed that when the defendant pointed to the backpack and said his identification was there he was giving his consent to letting the officers open the bag to get out his identification. Cf. Commonwealth v. Voisine, 414 Mass. 772, 783 (1983) (girlfriend pointed in direction of bedroom where defendant was hiding). Assuming without deciding that this was not enough for consent, the officers belief that it was consent would not make the opening of the backpack unlawful. The objective circumstances fully warranted the opening of the six-pound pack as part of a Terry weapons search. See Commonwealth v. Smigliano, 427 Mass. 490, 493 (1998) (circumstances warranted Terry stop of vehicle regardless of officer’s subjective state of mind).
Prior to cutting into the tape on the bricks, the officers had probable cause to believe that the bricks were illegal drugs. They thus had probable cause to look under the tape. These were not parcel post packages. The duct tape totally covered all the exterior surfaces of each brick. There were no labels or marks of any kind on the bricks. The corners and edges were rounded, and the bricks did not appear to be wrapped boxes or containers of any sort. They looked like nothing the officers had ever seen or handled before except the identical duct tape wrapped bricks of drugs that had been shown to them in police drug enforcement training.
The backpack had two of these bricks of the identical size, shape, weight and feel. This was a neighborhood and an apartment building where illegal drug activity was common. The defendant offered no reply when Officer Coady took out the first brick and asked if it was a bomb. Each officer confirmed the other in his experience-based belief that these were drug *517 bricks. Considering all the circumstances known to the officers and their specialized police knowledge and training, they had probable cause to seize the bricks and probable cause to search them by cutting into and looking under the duct tape. United States v. Prandy-Binett, 995 F. 2d 1069, 1071 (D.C. Cir. 1993) (duct tape wrapped brick); United States v. McDonald, 100 F. 3d. 1320, 1325-27 (7th Cir. 1996) (bricks felt through soft luggage on bus luggage rack); see Texas v. Brown, 460 U.S. 730, 734 (1983) (balloon commonly used to contain drugs); Commonwealth v. Ortiz, 376 Mass. 349, 353-55 (1978) (packaging of dime bag of heroin and other circumstances); Commonwealth v. Figueroa, 412 Mass. 745 (1992) (cellophane wrapped paper bag seen behind protruding interior wall panel of a car; defendant fled); Commonwealth v. Blatz, 9 Mass.App.Ct. 617 (1983); Commonwealth v. Lewis, 15 Mass.App.Ct. 617, 619 & n.2 (1983).
Contrary to the defendant Pagan’s argument, once the officers had probable cause to believe that the bricks were illegal drug bricks there was no requirement that they obtain a search warrant before looking under the tape. It is settled that “contraband . . . may be seized by the police without a warrant whenever it is within plain view and in a place where the police have a right to be.” Commonwealth v. Varney, 391 Mass. 34, 39 n. 4 (1984). The Supreme Judicial Court has declined to trivialize the right of privacy by recognizing “an alleged right to protect from inspection by government agents that which is lawfully obtained and appears to be contraband.” Id. at 39.
Alternatively, the probable cause to believe that the bricks were drug bricks also gave the officers probable cause to arrest Mr. Pagan. Once the officers discovered the two bricks and jointly concluded that they were bricks of illegal drugs, they had no intention of releasing the defendant. The defendant was effectively under arrest at that point, and looking under the tape was permissible as part of a search incident to arrest. Commonwealth v. Madera, 402 Mass. 156, 159-61 (1988). “The fact that a search precedes a formal arrest is not important, as long as probable cause existed independent of the results of the search.” Commonwealth v. Brillante, 399 Mass. 152, 154-55 n.5 (1987); see Rawlings v. Kentucky, 448 U.S. 98, 111 (1980).
IV. Further Rulings Regarding Cepeda’s Motion
The defendant Cepeda did not file a motion to suppress. He moved instead to join in the defendant Pagan’s motion to suppress. A defendant seeking suppression is required to file his own motion, clearly stating his grounds, along with a personal knowledge affidavit detailing the facts in support of the motion. M.R.Crim.P. 13(a)(2); Superior Court Rule 9. Failure to do so may properly result in denial of the motion. As a matter of discretion in this case, the court will treat Mr. Cepeda’s motion to join as an adequate motion to suppress that relies on the affidavit filed by Mr. Pagan. The court will not permit this as a regular practice.
The Massachusetts Article 14 exclusionary rule is so expansive that Cepeda has automatic standing to challenge the search of the backpack worn by Pagan when the trafficking charge depends on an element of possession. Commonwealth v. Frazier, 410 Mass. 235, 243-45 (1991). Cepeda’s motion to suppress is denied for the same reason as Pagan’s. Officer Coady’s opening of Pagan’s backpack and his cutting into the bricks were not unlawful under the United States or Massachusetts Constitutions.
V. Order
The defendant Cepeda’s Motion to Join Motion to Suppress of Co-Defendant Pagan is treated as a motion to suppress and is denied.
The defendant Pagan’s Motion to Suppress Statements and Evidence Seized Pursuant to Warrantless Search is denied.

 Counsel for the Commonwealth and for Mr. Pagan have assisted the court with exceptionally thorough memoranda.