Commonwealth *vs.* Daniel Carr
(and a companion case[1]).

No. 08-P-1985.

Middlesex. November 3, 2009. - December 23, 2009.

Present: Grasso, Berry, & Meade, JJ.

Further appellate review granted, 456 Mass. 1103 (2010).

*Practice, Criminal,* Motion to suppress, Findings by judge. *Search and Seizure,* Student, State action, Consent, Special police officer. *Constitutional Law,* Search and seizure, State action.

A Superior Court judge erred in allowing criminal defendants' motions to suppress drugs and other evidence seized by college campus police during a search, conducted with the consent of the defendants, of their dormitory room, where the officers' initial warrantless entry into the room to investigate a credible report of a weapon was authorized under the college's "conditions of residency" and did not require a search warrant or consent [46-50]; and where the facts and circumstances established that the defendants' consent was free and voluntary, and was neither coerced nor mere acquiescence to a claim of lawful authority [50-52].

Indictments found and returned in the Superior Court Department on June 28, 2007.

Pretrial motions to suppress evidence were heard by *Linda E. Giles*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *John M. Greaney*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Casey E. Silvia*, Assistant District Attorney, for the Commonwealth.

*Charles W. Rankin* (*Randy Gioia* with him) for the defendants.

Grasso, J. We consider whether a warrantless entry of a dormitory room and seizure of weapons by Boston College campus police pursuant to the college's "Conditions of Residency"

[1]Commonwealth *vs.* John Sherman.

requires suppression of drugs discovered during a subsequent search conducted with the consent of the room's occupants, Daniel Carr and John Sherman. A grand jury returned indictments against them for trafficking in cocaine, possession of psilocybin with intent to distribute, and possession of marijuana with intent to distribute.

After an evidentiary hearing, a judge of the Superior Court allowed the defendants' motions to suppress the drugs and other evidence seized. The judge concluded that the initial entry into the defendants' room was unlawful and that the subsequent search was not undertaken with the defendants' free and voluntary consent. A single justice of the Supreme Judicial Court allowed the Commonwealth's application for an interlocutory appeal. For the reasons that follow, we reverse the orders of suppression.

1. *The motion to suppress.* We summarize the facts found by the motion judge. Where relevant, we supplement the judge's factual findings "with uncontested testimony from the suppression hearing, mindful that assessment of witness credibility is the province of the motion judge." *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 11, 12 (2005) (citation omitted).

On February 14, 2007, at around midnight, April Wynn, a resident director at Boston College with oversight responsibility for Gonzaga Hall, contacted the campus police.[2] Wynn spoke with Sergeant John Derick, a twenty-year member of the campus police department. Wynn told Derick that two students who lived in Gonzaga Hall wanted to report a weapon inside a dormitory room.

Because the students feared that their identity would become known, Wynn accompanied them from Gonzaga Hall to the campus police office. The students told Derick that Daniel Carr had been bullying students and bragging about beating people up and having a knife. Both students had seen Carr waving a knife around. They also told Derick that a third student, whom they did not want to identify, had seen the butt of a gun, possibly fake, inside Carr's dormitory room. Derick confirmed that Carr lived in room 114 Gonzaga Hall.

---

[2]The parties do not dispute that pursuant to G. L. c. 22C, § 63, the Boston College campus police are special State police officers and "have the same power to make arrests as regular police officers for any criminal offense committed in or upon lands or structures owned, used or occupied by [the] college."

Pursuant to Boston College's "Conditions for Residency" all weapons of any kind, whether licensed or unlicensed and whether real, counterfeit, or toy, are prohibited and subject to confiscation.[3] All students who reside in a dormitory must read these rules and signify their assent to abide by them in order to reside in a dormitory.[4]

After speaking with the students, Derick met in Wynn's office with Boston College police Sergeant Anthony Cadogan, Officer Sean Daley, and Austin Ash, another resident director. The three police officers proceeded to 114 Gonzaga Hall together with the two resident directors. There, Derick knocked and identified himself as a campus police officer.

A male voice on the other side of the door replied, "Hold on. I've got to get my pants on." After thirty seconds elapsed with no response, Derick knocked again. The door opened a few seconds

---

[3]The pertinent section of the Conditions for Residency 2007-2008 provides:

"WEAPONS, FIREARMS, AND EXPLOSIVES

"Civil statutes prohibit the possession of firearms, fireworks or any other device of an explosive nature in the residence halls. University policy strictly prohibits the possession on University premises of any handgun, rifle, shotgun, bow and arrow, sling shot, BB gun, paintball gun, air rifle or other device of a physically harmful nature or which resemble actual items. Bomb threats are also a serious violation of policy as well as state and federal statutes.

"Students are advised that Massachusetts General Statutes, Chapter 269, Section 10, 'Dangerous Weapons' also prohibits knives, swords, nunchucks, and the like. Knives of any type, guns (firearms), real, counterfeit, or toy, or any weapon or object that could be used as a weapon is also prohibited and subject to confiscation by University authorities. All violations will be subject to University disciplinary action and will be referred to law enforcement authorities."

[4]Boston College's Conditions for Residency 2007-2008 also provides:

"RIGHT OF ENTRY

"The University reserves the right to enter resident student rooms and conduct a plain view search for: reasons of health, maintenance, upholding community standards (including safety and discipline) or inspections. Regular inspections will be conducted by staff in all areas. Except in cases of an emergency, a complete search of the contents of a student's room will only be made with: (a) his/her consent; (b) with a University Search Warrant issued by the Vice President for Student Affairs or his/her designee; or (c) with a duly authorized search warrant from a local court."

later, and Derick entered the room. Cadogan and Daley remained outside with Wynn and Ash. The officers were dressed in full uniform with holstered firearms.

Inside, Derick encountered three individuals. At Derick's request, Carr and Sherman identified themselves and indicated that they lived there. The third male, Zachary Taylor, said that he did not live there, and Derick asked him to leave. The room contained a set of bunk beds, two desks, two closets, a small futon type chair, and a large footlocker in the middle of the room.

Derick explained to Carr and Sherman that he was responding to a report of a gun in the room. Carr told Derick that he previously had a toy gun but had thrown it out. Derick did not believe this and read Carr his Miranda rights. Carr acknowledged that he understood them. Derick asked him where the gun was, and Carr replied by pointing to the bed and saying, "I think it's under the bed."

Derick reached under the bed and retrieved a light, hard plastic replica gun that closely resembled a .45 caliber handgun with a clip. The gun was missing a red tip that is characteristic of replicas, and Derick believed that it was capable of shooting some type of projectile.

After Derick discovered the gun, Cadogan and Daley entered the room. Derick asked Carr if there were any more weapons, and Sherman produced a folding buck knife from his waistband. In short order, the police also confiscated a smaller folding knife and a kubotan, a spiked martial arts weapon. Although the items violated the college's "Conditions of Residency," none appeared to be unlawful.

Derrick told the defendants that he would like to do a search of the room because, based upon his experience, he believed he would find more. Cadogan handed each a form, the top part of which is captioned "Miranda Waiver" and the bottom, "Consent to Search." Before signing, Carr asked if he could make a telephone call. Upon being told that he could, he made a call to his father from a nearby desk telephone. Carr was overheard telling his father, "It's no big deal. It's a fake gun. I don't know why they're here." Carr then handed the telephone to Derick. Carr's father asked Derick what was going on and why they were searching the room. Derick explained that they had found a weapon,

and that was prohibited on campus. Carr's father kept repeating to Derick, "It's just a fake gun . . . a toy gun. What's the big deal?"

Both defendants consented to a search of their room and inserted their names on the appropriate lines in the top and bottom portions of "Waiver" and "Consent" forms.[5] In the "Miranda Waiver" part of the form, the defendants inserted their names and responded to questions signifying that they had the ability to speak and understand English, that they had not consumed drugs or alcohol, and that no threats or promises had been made to them. Each signed the "Miranda Waiver." In the "Consent to Search" portion, each defendant entered his name in two places, the latter of which stated that he was "signing the form voluntarily, without threats or promises of any kind."[6] In the course of the search that followed, Daley inadvertently discovered a bag of psilocybin mushrooms underneath a backpack on the floor and a baggie filled with marijuana underneath the futon cushion. Twelve small bags of a white powdery substance believed to be cocaine

---

[5]The judge declined to decide whether the defendants gave their verbal consent to search. We consider this question to have been conceded prior to the motion hearing. In his affidavit in support of his motion to suppress, the defendant Carr acknowledged that after speaking with his father on the telephone he "gave the police permission to search" the room. At issue was whether his consent was voluntary.

For his part, the defendant Sherman did not assert in his affidavit or otherwise that he objected to the police search notwithstanding Carr's consent. See *Georgia* v. *Randolph*, 547 U.S. 103, 121 (2006); *Commonwealth* v. *Ocasio*, 71 Mass. App. Ct. 304, 308-309 (2008).

[6]The completed "Consent to Search" form reads:

"I (defendant's name) have been informed by *Sgt. Cadogan* of the Boston College Police that I may have the Constitutional right to refuse to allow a search be made of my living quarters, property, car, and/or person without a search warrant. I understand this right and I hereby waive the necessity of a search warrant and do authorize _____ of the Boston College Police to conduct a search of my living quarters, property, car and/or person without a search warrant and to take possession of any material which is connected in any way with the investigation they are making.

"I [defendant's name] am signing this form voluntarily without threats or promises of any kind."

There is no dispute that the police did *not* orally advise the defendants that they had a constitutional right to refuse a search.

fell out of a winter jacket, and two more baggies of cocaine were located under the bunkbeds. A pipe with marijuana residue was found in a coat hanging on the back of the door. After discovering these items, the police arrested the defendants and handcuffed them.

Inside the footlocker in the middle of the floor, the officers found a locked box that emanated a pungent odor of marijuana. Carr stated that he did not know where the key was, but Derick observed a set of keys nearby, and one opened the box.[7] Inside, Derrick found individually packaged baggies of marijuana, ten marijuana cigarettes, rolling papers, seeds, and the defendants' passports. In Sherman's desk, the police located a piece of paper containing names, amounts of money, and marijuana residue.

2. *Discussion.* "[W]e accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' "[8] *Commonwealth* v. *Costa,* 65 Mass. App. Ct. 227, 229-230 (2005), quoting from *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott, supra,* quoting from *Commonwealth* v. *Mercado,* 422 Mass. 367, 369 (1996).

The judge concluded that because Derick entered the room immediately, without awaiting invitation, the initial entry was an unlawful intrusion under the Federal and State Constitutions, and that any consent, whether to enter or search, was not voluntarily given.[9] We disagree. We conclude that the initial entry into the defendants' room to investigate a credible report of a weapon in the room was authorized under the college's "Conditions of Residency" and did not require a search warrant or consent. We

---

[7]While disclaiming knowledge of the key, Carr did not object to the police opening the box.

[8]There is no record support for the judge's finding that Derick's request, "I would like to search the room," sounded more like an order than a request. Nothing in direct or cross-examination addresses the tone in which Derick made his request or supports a finding that the request amounted to a command.

[9]We agree with the judge that at the time of entry the police lacked probable cause to believe that evidence of criminal activity would be found in the room or that exigent circumstances justified dispensing with the warrant requirement in such event.

also conclude that the subsequent permission to search was not the fruit of a prior unlawful entry and was freely and voluntarily given.

(a) *The warrantless entry.* It cannot be gainsaid that Boston College is a private actor not subject to the constraints of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. See *Commonwealth v. Considine,* 448 Mass. 295, 299-300 (2007) (search of students' rooms by private school officials is not State action for Fourth Amendment or art. 14 purposes). See also *Burdeau v. McDowell,* 256 U.S. 465, 475 (1921); *Commonwealth v. Richmond,* 379 Mass. 557, 561-562 (1980) (Fourth Amendment and exclusionary rule apply only to State action). Nor is there any question that under the college's "Conditions of Residency," Wynn and Ash possessed the right to enter the defendants' room and make a "plain view search"[10] for prohibited items without implicating the Fourth Amendment or art. 14.[11]

Not so easily resolved is whether enlisting the assistance of the campus police to accomplish what Wynn or Ash clearly could have accomplished on their own transforms the encounter into a search and seizure that violates the requirements of the Fourth Amendment and art. 14. Specially commissioned officers formally affiliated with the sovereign and possessing authority beyond that of an ordinary citizen such as arrest and use of weapons are treated as State agents subject to constitutional constraints as to search and seizure. See *Commonwealth v. Leone,* 386 Mass. 329, 334-335 (1982). However, the constitutional constraints upon such special police officers performing investigatory duties "does not mean that the bounds of permissible conduct are the same for the privately employed special officer as they would be for an ordinary police officer." *Id.* at 335. The private function adds a

___

[10]We construe the term "plain view search" in the "Conditions of Residency" as encompassing and permitting college officials to make both plain view observations of prohibited items and plain view seizures of those prohibited items that are in plain view. See *Commonwealth v. Ciaramitaro,* 51 Mass. App. Ct. 638, 644-645 & n.11 (2001).

[11]Even in a public college, the search of students' dormitory rooms by college officials is proper when the student has consented to reasonable searches to enforce the college's health and safety regulations by signing a residence contract. *Commonwealth v. Neilson,* 423 Mass. 75, 79 (1996), discussed *infra.*

new aspect to his activities that is relevant to proper application of constitutional protections against search and seizure. *Ibid.* "The action he takes on behalf of his employer may be a lawful and necessary means of protecting the employer's property, although it would be impermissible if taken on behalf of the State in pursuit of evidence. When the guard's conduct is justified by his legitimate private duties, it should not be treated as lawless, or 'unreasonable' search and seizure." *Id.* at 335-336 (internal citations omitted).

Applying the principles set forth in *Leone* to the circumstances here, we hold that while the Fourth Amendment and art. 14 apply to the conduct of Boston College's campus police, in this circumstance the officers' private function affects the constitutionality of their conduct and renders it reasonable. See *Commonwealth* v. *Leone*, 386 Mass. at 334-338 (decided solely on Fourth Amendment grounds). See also *Commonwealth* v. *Considine*, 448 Mass. at 301, nn.13-14 (suggesting in dictum that any search or seizure of contraband by State police officer acting on invitation of private school officials is permissible). The initial entry into the defendants' room and the discovery and seizure of the facsimile handgun and other weapons were actions reasonably undertaken by the police on behalf of the legitimate interests of their employer Boston College, a private institution and not a State actor. See *Commonwealth* v. *Leone*, 386 Mass. at 335-336. In consequence, their entry into the room without a search warrant does not offend Federal or State constitutional requirements.

The entry was not in furtherance of a criminal investigative function, but to address a violation of Boston College's policy that prohibited weapons in the dormitory (whether lawful or unlawful, real or counterfeit) and authorized confiscation of such items found in plain view. The police acted on reliable information from two identified students that Carr, who resided in room 114 Gonzaga Hall, possessed a knife. Adding to the concern was the report that another student had seen a gun or the butt of a gun inside Carr's room. Although the report of the gun, being anonymous, lacked the reliability of that regarding the knife, the fact that the police harbored concern of an even more serious infraction is immaterial. See *Commonwealth* v. *Blevines*, 438 Mass. 604, 608 (2003) (officer's subjective purpose not relevant when search permissible on objective standard).

Measured against the factors set forth in *Leone* for assessing the constitutional propriety of a special police officer's actions, the actions of the Boston College campus police pass constitutional muster. See *Leone, supra* at 337-338. First, at the time they went to room 114, the police were acting under the control of their private employer, Boston College. The resident director enlisted police assistance, not vice versa.[12] Second, the officers' actions were unquestionably related to the college's private purposes of ascertaining that weapons, whether real or counterfeit, were not present in the dormitories. The investigation was a legitimate means of protecting the college's property and fulfilling its obligation to provide a safe environment for its residents. Third, the officers acted reasonably. They went to the room, knocked on the door, awaited response from the occupants, entered, arranged to speak only with the residents, asked them whether they had such weapons, and confiscated the weapons that the defendants acknowledged having. We discern nothing offensive to the individual dignity of the students in the manner and methods employed by the police to locate and seize the prohibited items. When Carr acknowledged that the gun was under the bed, the police were not required to let him retrieve it rather than retrieving it themselves. See *Commonwealth* v. *Guthrie G.*, 66 Mass. App. Ct. 414, 418-419 (2006). See also *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993); *Commonwealth* v. *Hill*, 57 Mass. App. Ct. 240, 243-245 (2003).

Nothing in *Commonwealth* v. *Neilson*, 423 Mass. 75 (1996), is to the contrary. There, officials of Fitchburg State College, a public actor, entered a dormitory room to investigate the prohibited keeping of a pet. The college had expressly reserved the right to inspect dormitory rooms. In the course of investigation, the officials inadvertently discovered marijuana being cultivated. Rather than seizing the marijuana and turning it over to the police, or providing information to the police with which a search warrant could be obtained, the officials invited the police to enter. The court in *Neilson* concluded that the constitutional violation

---

[12]Indeed, it would make little sense to require private college officials seeking to enforce the college's policies against weapons to do so personally rather than utilizing the expertise of the campus police, the college's employees with the most experience in dealing with objects that might prove dangerous.

occurred not when the college officials entered to enforce the college's health and safety regulations, but when the police entered the room, searched, and seized evidence without a search warrant, consent, or exigent circumstances. See *id.* at 79. As observed in *Neilson*, the defendant's consent was given not to the police, but to the college officials, who "had no authority to consent to or join in a police search for evidence of crime." *Ibid.*, quoting from *Piazzola* v. *Watkins*, 442 F.2d 284, 290 (5th Cir. 1971). In contrast to *Neilson*, here the police entered to enforce a residency condition relating to the health and safety of all the dormitory occupants, not in furtherance of a criminal investigation.

(b) *Voluntariness of consent to search.* While the initial entry and discovery of weapons did not require a search warrant or consent of the defendants, the search leading to the discovery of the drugs stands on different footing. Whether done in furtherance of Boston College's policies or for criminal investigative purposes, such a search required the consent of the defendants.[13] The Commonwealth bears the burden of proving that such consent was given freely and voluntarily. *Commonwealth* v. *Rogers*, 444 Mass. 234, 237-238 (2005). Whether consent is free and voluntary is to be determined from all the circumstances. *Commonwealth* v. *Yehudi Y.*, 56 Mass. App. Ct. 812, 816-817 (2002). See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227 (1973).

Upon the facts, the motion judge erred in ruling that the Commonwealth failed to meet that burden. To the contrary, the facts establish that the defendants' consent was freely and voluntarily given. See *Commonwealth* v. *Guthrie G.*, *supra* at 418 (juvenile's consent to three officers free and voluntary). The judge's conclusion that the unlawful entry by the police rendered invalid the defendants' consent to a search of the room fails as matter of law. Because the initial entry and discovery of the prohibited weapons was lawful, the entry does not render any subsequent consent involuntary. Compare *Commonwealth* v. *Midi*, 46 Mass. App. Ct. 591, 595 (1999) (prior invalid entry taints subsequent consent to search); *Commonwealth* v. *Allen*, 54 Mass. App. Ct. 719, 721-722 (2002).

---

[13]To perform a search such as that which led to the discovery of the drugs, under the "Conditions of Residency" even Boston College officials would have required consent, a "University Search Warrant," or a search warrant from a court.

Similarly, the judge erred in concluding that the Commonwealth failed to meet its burden of proving that the defendants' consent was free and voluntary. See *Commonwealth* v. *Wallace*, 70 Mass. App. Ct. 757, 762-764 (2007) (consent to search free and voluntary where no prior illegality, defendant free to leave, and understood he had right to refuse). "Whether consent is voluntary depends on the nature of [the] interaction between the police and the occupant." *Commonwealth* v. *Rogers*, 444 Mass. at 238. Contrary to the motion judge's view, neither the officers' request to search nor the defendants' responses are ambiguous. As noted earlier, the defendants did not place in issue whether consent was given but only whether the consent was given freely and voluntarily.[14]

While the judge appears to have concluded that the defendants' consent was not free and voluntary because they may not have felt free to refuse the officer's request or leave the room, the facts found point the other way. That the police were armed, in uniform, and represented an "institutional presence" is a characteristic common to most, if not all, police encounters. More importantly, the police did not display their weapons or otherwise employ force. They knocked on the door and announced their presence to obtain entry, entered lawfully only after Carr opened the door, and explained their presence and purpose. Upon locating prohibited weapons, Derick explained his reason for wanting to conduct a more extensive search and his request for the defendants' consent. Prior to giving his consent, Carr asked to confer with his father and did so. Carr's father also spoke with Derick. Neither defendant was in custody at the time consent was given, and they were not arrested until after drugs were found in the course of the search. See *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 178 (1980). The defendants placed no limitation on their consent, expressly or by implication. See *Commonwealth* v. *Gaynor*, 443 Mass. 245, 254 (2005).

Nothing in the facts supports the conclusion that the request to search and the accompanying "Consent to Search" form were commands to which the defendants meekly acquiesced. The defendants were college students whose age and level of education equipped them to understand what was being asked of them

[14]See note 6, *supra*.

and that they had an option to refuse. See *Commonwealth* v. *Burgess*, 434 Mass. 307, 309-311 (2001) (consent to search validly given by eighteen year old with limited education and history of substance abuse); *Commonwealth* v. *LeBeau*, 451 Mass. 244, 258-260 (2008) (consent to search free and voluntary and made with knowledge that he could refuse); *Commonwealth* v. *Guthrie G.*, *supra*. They were not unusually susceptible or impressionable.

The failure of the police to advise the defendants orally that they could refuse does not vitiate the consent given. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 97-98 & n.10 (1997); *Commonwealth* v. *Costa*, 65 Mass. App. Ct. at 231-232 (Miranda type warning not necessary prerequisite to valid consent to search). Moreover, the written consent form advised the defendants that they "may have a constitutional right to refuse." See *Commonwealth* v. *Sanna*, *supra*. Indeed, the very fact that the police sought the defendants' *written* consent to search demonstrates that the police were not claiming the right to search further, but seeking permission to do so. A person of average intelligence would necessarily comprehend that refusal was an option.

In sum, despite the result reached by a conscientious motion judge, we conclude as a matter of our independent judgment that the facts and circumstances establish that the consent was free and voluntary and neither coerced nor mere acquiescence to a claim of lawful authority. See *Commonwealth* v. *Voisine*, 414 Mass. at 783; *Commonwealth* v. *Heath*, 12 Mass. App. Ct. 677, 684-685 (1981).

*Orders allowing motions to suppress reversed.*