COMMONWEALTH *vs.* DANIEL CARR
(and five companion cases[1]).

Middlesex. October 4, 2010. - November 17, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Controlled Substances. Practice, Criminal,* Motion to suppress, Findings by judge. *Search and Seizure,* Student, State action, Consent. *Constitutional Law,* Search and seizure, State action.

A Superior Court judge, in granting two criminal defendants' pretrial motions to suppress illegal drugs and other evidence resulting from a search of a college campus dormitory room, did not err in finding that the Commonwealth failed to satisfy its burden of proving the voluntary consent of the defendants to the search of their room following the campus police officers' initial warrantless entry, where the evidence of the defendant's actual consent was equivocal [299-302]; and where there was no clear error on the part of the judge in concluding that there were coercive aspects to the officers' exercise of authority that would vitiate a finding of voluntariness [302-303].

INDICTMENTS found and returned in the Superior Court Department on June 28, 2007.

A pretrial motion to suppress evidence was heard by *Linda E. Giles,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court. After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Charles W. Rankin* for John Sherman.

*Casey E. Silvia,* Assistant District Attorney (*Melinda L. Thompson,* Assistant District Attorney, with her) for the Commonwealth.

*Randolph Gioia,* for Daniel Carr, was present but did not argue.

[1] Two against Daniel Carr and three against John Sherman.

*John Reinstein,* for American Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

CORDY, J. On June 28, 2007, a grand jury indicted the defendants, two Boston College students, Daniel Carr and John Sherman, on charges that they trafficked in cocaine over fourteen grams, possessed psilocybin with intent to distribute, and possessed marijuana with intent to distribute, following discovery of the illegal drugs in their campus dormitory room. On December 17, 2007, Carr filed a motion to suppress the drugs and other evidence seized as a result of a warrantless search. Sherman filed a similar motion and a motion to suppress his statements to the college police. After an evidentiary hearing, the judge granted the defendants' motions to suppress.

On interlocutory appeal, the Appeals Court reversed. *Commonwealth* v. *Carr,* 76 Mass. App. Ct. 41 (2009). We granted the defendants' application for further appellate review to consider the Commonwealth's challenge to the judge's findings that the initial warrantless entry into the room by Boston College police officers was unlawful, and that the defendants did not voluntarily consent to the subsequent search of their room. We conclude that the judge did not err in finding that the Commonwealth failed to satisfy its burden of proving the voluntary consent of the defendants to search their room. We affirm. Because the drugs and other evidence will be suppressed, we need not decide whether the initial entry into the room was lawful.[2]

1. *Background.* The following facts are drawn from the judge's findings and the uncontested testimony at the motion hearing. Around midnight on February 14, 2007, Sergeant John Derick of the Boston College police department received a telephone call from April Wynn, resident director of Gonzaga Hall on the Boston College campus. Wynn told Sergeant Derick that she had received a report from two students that a "weapon" was inside a room in Gonzaga Hall. Wynn brought the two students

---

[2]Sherman's motion to suppress statements he made to the Boston College police officers on the night of February 14, 2007, is based on claimed inadequate Miranda warnings on the Miranda waiver and consent to search form that he signed. The judge did not address the issue, and neither the Commonwealth nor the defendants raise it on appeal. Sherman does not point to any statements he made before the unconsented-to search that are relevant to the charges pending against him.

to the campus police station, and they told Sergeant Derick that Carr had been bullying students and bragging about having a knife. The students stated that there was a third student, who wished to remain anonymous, who reported seeing the butt of a gun, possibly a toy gun, inside Carr's room.

Sergeant Derick, along with Sergeant Anthony Cadogan and Officer Sean Daley, met with Wynn and another resident director, Austin Ash, in Wynn's office. The three officers and two resident directors then proceeded to Carr's room. The officers were all uniformed and armed. Sergeant Derick knocked on the door and announced himself as a Boston College police officer. A male voice inside the room stated, "Hold on, I've got to put my pants on." Sergeant Derick knocked again after approximately thirty seconds had elapsed, and the door was opened. Sergeant Derick entered the room and the other two officers remained just outside the doorway. There were three young men in the room.

Sergeant Derick asked who lived in the room. One of the men, later identified as Zachary Taylor, stated that he did not live in the room and Sergeant Derick told him to leave. After Taylor left the room, Sergeant Derick told Carr and Sherman that he had received an anonymous report of a gun or weapon in the room. Carr stated that he had a "fake" gun but had thrown it out. Sergeant Derick then read Carr his Miranda rights and asked him where the gun was. Carr said, "I think it's under the bed," and pointed to the bed. Sergeant Derick reached under the bed and retrieved what looked like a .45 caliber handgun but, on closer inspection, proved to be a replica gun that may have been capable of shooting a projectile. The other two officers then entered the room and Sergeant Derick asked the students if there were more weapons in the room. Sherman produced and handed over a folding knife. A smaller knife was later found in a desk drawer and a kubotan, a martial arts weapon, was also recovered.

Based on his experience, Sergeant Derick believed that there could be more weapons in the room and told the defendants he wanted to search the entire room. Sergeant Cadogan handed each of the defendants a form that contained two parts: the top half, a "Miranda waiver," contained text and a line for a signature; the bottom half, "consent to search," also contained

text, and had a line at the bottom that did not indicate whether it was for a signature.[3] Carr asked if he could make a telephone call and was allowed to do so. Carr telephoned his father, who then spoke with Sergeant Derick, telling him, "It's just a cap gun . . . a toy gun. What's the big deal?" Each defendant filled out the form, signing the Miranda waiver, but neither defendant placed a signature on the "consent to search" half of the form.

Sergeant Cadogan and Officer Daley conducted a full search of the room while Sergeant Derick stepped out of the room to update Wynn and Ash. During the course of the search, Officer Daley found a bag of psilocybin mushrooms and a bag of marijuana. The defendants were then asked to step into the hallway and were placed under arrest. Subsequently, twelve bags of a white powdery substance were found in a jacket that both defendants said belonged to Taylor.[4] Two additional bags containing white powder were found under the beds. There was a footlocker in the middle of the room that contained a locked box smelling of marijuana. The officers found a key in a desk drawer and opened the box, which contained ten marijuana cigarettes, rolling papers, seeds, and the defendants' passports. The officers also found a marijuana pipe and a piece of paper listing names and amounts of money.

2. *Motion to suppress.* In reviewing the grant or denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and accord "substantial deference" to the judge's ultimate findings. *Commonwealth* v. *Monteiro*, 396 Mass. 123, 131 (1985), citing *Commonwealth* v. *Doucette*, 391 Mass. 443, 447 (1984). "On a motion to suppress, '[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses, and not [the appellate] court.' " *Commonwealth* v. *Yesilciman*, *supra*, quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). "The clear error standard is a very limited form of review. . . . Where there has been conflicting testimony as to a

---

[3]The officers also testified as to their recollections of what the defendants said after Sergeant Derick stated that he wanted to search the entire room. We summarize and discuss that testimony below.

[4]Taylor was later arrested and charged with possession of cocaine.

particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted." *Commonwealth* v. *Yesilciman, supra,* quoting *Commonwealth* v. *Spagnolo,* 17 Mass. App. Ct. 516, 517-518 (1984). A "trial judge's ruling on a motion to suppress may be reversed where the facts found are clearly erroneous or 'where justice requires [that the appellate court] substitute its judgment for that of a trial judge at the final stage.' " *Commonwealth* v. *Spagnolo, supra* at 517, quoting *Commonwealth* v. *Moon, supra.* "The ultimate legal conclusions to be drawn from the subsidiary findings of fact, however, are matters for review by this court." *Commonwealth* v. *Robinson,* 399 Mass. 209, 215 (1987).

a. *Consent.* "When the police rely on consent to justify a warrantless [search], under both the Fourth Amendment [to the United States Constitution] and art. 14 [of the Massachusetts Declaration of Rights], the prosecution 'has the burden of proving that the consent was, in fact, freely and voluntarily given.' " *Commonwealth* v. *Rogers,* 444 Mass. 234, 237 (2005), quoting *Bumper* v. *North Carolina,* 391 U.S. 543, 548 (1968). "[T]he Commonwealth must provide us with more than an ambiguous set of facts that leaves us guessing about the meaning of this interaction and, ultimately, the occupant's words or actions . . . . If either the officer's request or the occupant's response is so ambiguous that we are unable to discern whether the occupant voluntarily consented to [the search], our inquiry will be over and the entry must be deemed unlawful." (Citations omitted.) *Commonwealth* v. *Rogers, supra* at 238-239.

The judge found that the Commonwealth had not established that the defendants gave consent to search their room. She based this finding on what she described as "discrepant" testimony and what she found to be "equivocat[ion]" in Sergeant Cadogan's testimony. The evidence presented to the judge supports this finding.[5]

---

[5]In a footnote, the Appeals Court concluded that, because Carr stated in an affidavit that he "gave police permission to search," the issue of actual consent has been conceded by the defendants. *Commonwealth* v. *Carr,* 76 Mass. App. Ct. 41, 45 n.5 (2009). The affidavit was not part of the evidentiary record before the judge and cannot be considered on appeal. The question of actual consent was a live and contested issue argued at the motion hearing. The judge properly ruled on the evidence presented by the Commonwealth, which did not include Carr's affidavit.

Sergeant Derick's only testimony on the subject was that after he stated that he would like to search the room, he "asked that they fill out the consent to search," and the defendants were handed the forms. Sergeant Cadogan testified that after Sergeant Derick said he wanted to search the room, the defendants were each given a form, and "[t]hey just filled it out." When asked if there was any verbal response, Sergeant Cadogan first stated that there was none, but on redirect examination then stated that they said, "yes."[6] On cross-examination, Sergeant Cadogan again stated that "one of them said something." When given his original

---

[6]On direct examination of Sergeant Cadogan, the following exchange took place:

THE PROSECUTOR: "Okay. Did you ask if you could search the room?"

DEFENSE COUNSEL FOR CARR: "Objection."

THE JUDGE: "I'll allow it."

THE WITNESS: "Correct."

THE PROSECUTOR: "Okay. And then you gave the paper?"

THE WITNESS: "Correct."

THE JUDGE: "And what was the response?"

THE WITNESS: "They just filled it out, Your Honor."

THE JUDGE: "So you asked the question. Was the question asked to both gentlemen?"

THE WITNESS: "Both gentlemen."

THE JUDGE: "And what was the response, if any?"

THE WITNESS: "Well, we have a — we asked them we have a consent to search form. Do you want us searching your room. You need to fill this out, and they just filled it out, Your Honor. Just one party had to make a phone call."

THE JUDGE: "Specifically to that question, did either of the students make any verbal response?"

THE WITNESS: "No, ma'am."

THE PROSECUTOR: "They did not say 'yes' or 'no' when asked if you could search the room?"

THE WITNESS: "I think one of them said 'yes,' but it was no[t], 'no, you can't search my room.' "

THE PROSECUTOR: "Okay. Did they say 'yes' or did they say 'no'?"

THE WITNESS: "They said yes."

THE JUDGE: "Who is it? When you say 'they,' could you be more specific? Did both of them say, 'yes, you can search.' "

THE WITNESS: "The one that wasn't on the phone, he was in the room. He said, 'Yes, you can search the room.' And then shortly after the party that was on the phone came off and filled out the form."

report from the incident to refresh his memory, Sergeant Cadogan then stated that it was his testimony that he did not hear a verbal response from either defendant.[7] Officer Daley testified that Carr

---

[7]The following exchange then took place on recross-examination of Sergeant Cadogan by Sherman's defense counsel:

DEFENSE COUNSEL FOR SHERMAN: "So, as you sit here today your testimony is you think one of them may have said something."

THE WITNESS: "I know one of them said something."

DEFENSE COUNSEL FOR SHERMAN: "You know one of them said something?"

THE WITNESS: "Correct."

DEFENSE COUNSEL FOR SHERMAN: "Now, do you recall writing a report?"

THE WITNESS: "Do I recall writing a report?"

DEFENSE COUNSEL FOR SHERMAN: "Yep."

THE WITNESS: "You have a copy."

DEFENSE COUNSEL FOR SHERMAN: "You wrote a report."

THE WITNESS: "I did."

DEFENSE COUNSEL FOR SHERMAN: "And there's nothing in the report about any verbal agreement by John Sherman that you could search his room; is that right?"

THE WITNESS: "I'd have to look at the report, sir."

DEFENSE COUNSEL FOR SHERMAN: "Okay. Same report. And I'd just ask you to pay attention to the third paragraph. You can read it to yourself."

. . .

DEFENSE COUNSEL FOR SHERMAN: "So, there's nothing in here about Mr. Sherman giving verbal permission to search, correct?"

THE WITNESS: "Correct."

DEFENSE COUNSEL FOR SHERMAN: "So you described it in your report essentially what your first answer was to that question, correct?"

THE WITNESS: "Correct."

DEFENSE COUNSEL FOR SHERMAN: "That the individual was asked for permission to search and given a form?"

THE WITNESS: "Correct."

DEFENSE COUNSEL FOR SHERMAN: "And there's nothing here in your report about Mr. Sherman saying, 'Yes, you can search.' "

THE WITNESS: "He didn't say no either."

DEFENSE COUNSEL FOR SHERMAN: "Okay. It's not in — nothing in here."

THE WITNESS: "Correct."

THE JUDGE: "Your memory now is that you didn't hear any verbal response. A form was handed to this gentleman?"

THE WITNESS: "Correct"

THE JUDGE: "Okay. So that's your testimony."

THE WITNESS: "Correct."

"stated yes" when Sergeant Derick asked if they could search the room. He also testified that he asked Sherman if they could search his part of the room and Sherman "stated yes" and began to fill out the form. However, on cross-examination by Sherman's counsel, Officer Daley stated that when he asked Sherman to fill out the form, Sherman began to fill out the form, and that was the extent of the conversation.

The judge was not persuaded that there was consent to the search based on the forms that were partially filled out by the defendants. After reviewing the forms, it is clear that both defendants placed their signature on the Miranda waiver portion of the form, but neither placed a signature on the half that gives consent to search. In sum, the evidence before the judge as to consent was equivocal and supported her conclusion that the Commonwealth had not met its burden.

b. *Voluntariness of consent.* In addition to finding that the Commonwealth had not satisfied its burden of proving actual consent, the judge went on to say that, even if she was able to "determine clearly that either defendant had given consent to search, there were coercive aspects to the officers' exercise of authority that would vitiate a finding of voluntariness." "The question whether consent was voluntary is a question of fact to be determined in the circumstances of each case, with the burden of proof on the government." *Commonwealth* v. *Aguiar,* 370 Mass. 490, 496 (1976). The Commonwealth must prove "consent unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Walker,* 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976), quoting *Bumper* v. *North Carolina,* 391 U.S. 543, 549 (1968). While no factor by itself is conclusive, factors to consider include, but are not limited to: the presence of armed, uniformed officers; whether the defendant was informed of his right to refuse consent; the age, intelligence, and other personal characteristics of the defendant; and whether the defendant was in custody when consent was given. See *Commonwealth* v. *Sanna,* 424 Mass. 92, 97-98 n.10 (1997); *Commonwealth* v. *Harmond,* 376 Mass. 557, 561-562 (1978).

The judge's ultimate conclusion that the Commonwealth had not proved voluntary consent was supported by her subsidiary

findings that: (1) "[Sergeant] Derick immediately demanded the occupants' identities and ordered Taylor to leave; thus, his very first acts had a compulsory dimension to them"; (2) the "armed officers completely blocked the only exit[,] and the two resident directors [stood] in the hallway[, lending] further institutional presence"; (3) "[Sergeant] Derick signaled his distrust of the defendants"; and (4) Sergeant Derick's "pronouncement, 'I would like to search the room,' sounded more like an order than a request."[8] The judge found that "an objective person would not have felt able to refuse the officer's request or leave the room." Each of her subsidiary findings were in turn based on testimony adduced at the hearing.

The Appeals Court concluded "as a matter of . . . independent judgment that the facts and circumstances establish that the consent was free and voluntary and neither coerced nor mere acquiescence to a claim of lawful authority." *Commonwealth* v. *Carr*, 76 Mass. App. Ct. 41, 52 (2009). Because a finding of voluntariness is a question of fact, it should not be reversed absent clear error by the judge. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). "So long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it. 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 510 (1997), quoting *Gallagher* v. *Taylor*, 26 Mass. App. Ct. 876, 881 (1989).

The judge was in the best position to assess the weight and credibility of the testimony given at the motion hearing. Although the Appeals Court reviewed the evidence presented and concluded that consent was voluntarily given, its alternate view of the facts and circumstances does not indicate clear error on the part of the judge, and we find none.[9]

3. *Conclusion.* The Commonwealth failed to satisfy its burden to prove that consent was freely and voluntarily given; therefore,

---

[8]It is also plain from the record that this encounter took place around midnight.

[9]The judge also concluded that any consent was obtained through the exploitation of a prior illegality — the initial entry into the room. We do not consider this in our assessment of her conclusions that consent had not been established and consent was not given voluntarily.

we affirm the judge's order allowing suppression of the drugs and other evidence seized in an illegal search of the defendants' room.

*So ordered.*