Leibensperger, Edward P., J.
Defendant is charged with illegal possession of a firearm and other firearm-related offenses. The sum and substance of the Commonwealth’s case is that the firearm was discovered by police upon a search of defendant while in the bedroom of an apartment where his friend resided. Defendant’s motion to suppress contends that the police were in violation of the Fourth and Fourteenth Amendments to the United States Constitution and articles 12 and 14 of the Massachusetts Declaration of Rights by entering the apartment and conducting the search of defendant. Thus, the discovery and seizure of the firearm, as well as any statements made by defendant during the search and seizure, should be suppressed. For the reasons articulated below, I agree and the motion to suppress is ALLOWED.
Findings of Fact
The apartment at issue was located on Washington Street in the Roxbury section of Boston. The legal tenant of the apartment was Janelyn Diaz. She testified at the hearing. Ms. Diaz has three sons who lived with her at the time: Averyk Carasquillo, Noel Carasquillo and Joshua. On February 21, 2012, Averyk was 19 years old, Noel was 17 and Joshua was 8. On that date, while she was in the apartment, Averyk was present with two friends, defendant and Dennis Walker, in Averyk’s bedroom. Noel was also present in the apartment. Ms. Diaz knew defendant from prior occasions in the two to three months before February 21, including approximately two nights when he had slept over at her apartment. He had not stayed in her apartment the previous night on February 20 and he did not live in the apartment. On the afternoon of February 21, defendant was in the apartment with her permission. She had a good relationship with defendant.
Ms. Diaz was unaware that defendant had a firearm in his possession. She testified that if she had been aware defendant was in possession of a firearm, he would not have had permission to be in the apartment.
Prior to 5:30 pm, Ms. Diaz left the apartment to pick up Joshua at school. She left knowing that defendant was in the apartment, with her permission, along with *515 her sons and Walker. When she returned, the door to the apartment was open and two police officers were inside. She was told that the police had confiscated a gun from defendant.
Boston police officer Daniel Griffin testified. He is a member of the youth violence strike force, known as the gang suppression unit. Part of his job is to get to know the individuals in the community, including those who are suspected to be members of gangs. On Februaiy 21, 2012, he was wearing plain clothes with a chain around his neck carrying a police badge. He carried a firearm, visible on his hip. The chain and badge were visible on top of his outermost clothing. Griffin was accompanied by another police officer, Bruce Higgins, who was dressed in the same way. They arrived at the apartment to serve a subpoena on Aveiyk to appear and testify before the grand juiy in a murder case. Aveiyk was known to Griffin as a member of a gang and as an individual who had been involved with firearms. The police did not have a search warrant.
Griffin and Higgins arrived at the apartment at approximately 5:40 p.m. They knocked on the door but made no verbal announcement identifying themselves. One of the officers held the subpoena in his hand in a position to be seen by the person opening the door. Noel opened the door. Griffin asked “Is Aveiyk at home?” No request for entry was made. No questions were put to Noel as to who he was or what authority he had to be there. Noel said nothing in response to the question of whether Aveiyk was at home. In fact, there was no verbal exchange other than the single question regarding whether Averyk was at home.
Noel testified at the hearing. He is an unassuming, mild-mannered individual who appears younger than his seventeen years. He testified that he “never gets in trouble” and is not a member of any gang. He stated that he was unaware that he could refuse to allow the police officers entry to the apartment. He presented as an unsophisticated young man who testified credibly about the events of that afternoon.
Noel, who was in the apartment but not in Averyk’s bedroom, heard the knock at the door. He went to the door to open it. Noel immediately recognized the two individuals at the door as police officers. According to Noel, he first closed the door when he saw the two police officers but then immediately re-opened it. Noel testified that when asked about Averyk he looked to his left down the hall towards Aveiyk’s bedroom. At the same time, one of the police officers stepped in to Noel’s right and Noel took a few steps back to get out of his way. Then the second police officer came into the apartment. In mild contrast to Noel’s testimony, Griffin testified that Noel pointed to his left when asked whether Aveiyk was at home and then stepped away as a gesture for the police to enter. I characterize the difference in testimony as “mild” because I find, based on the testimony of both witnesses, that the gestures of Noel as described by either witness were ambiguous as to whether they indicated a consent for the police to enter. There was no verbal request to enter and no verbal response by Noel allowing entiy.
Photographs of the interior of the apartment and a drawing of the layout were introduced in evidence. Upon entering the apartment, there is a hallway to the right that leads to Averyk’s bedroom. The hallway is approximately 6 to 10 feet to the door of the bedroom. If a person goes around the open entiyway door and looks down the hallway, and if the door to the bedroom is open, a person standing in the entryway can see only into a corner of the bedroom where there was a television on a stand (Exhibit 1). A person in the entiyway cannot see into the rest of the bedroom, including where there is a bed.
Upon entering the apartment, Griffin saw Aveiyk walk out of his bedroom and up the hall towards the officers. Griffin, knowing Aveiyk on sight, shook hands with Aveiyk. Averyk then passed through to the entiyway where he began talking with the other officer, Higgins. Griffin proceeded, of his own accord, into the bedroom. Griffin testified that no person, including Aveiyk, invited Griffin into the bedroom. Griffin admitted he had no probable cause, or even suspicion, that a crime was being committed.
When Griffin entered the bedroom he saw Walker and defendant sitting on the bed. Noel came in to the room and also sat on the bed. Griffin stood near the entrance door of the bedroom a few feet away from the bed. Griffin commenced informal conversation, saying hello to Walker and defendant, both of whom he knew from previous dealings, and asking “what’s up”? Specifically, Griffin knew that Walker had previously been arrested for a shooting and that defendant was associated with a gang and had a prior arrest concerning a firearm. Walker responded to Griffin in a relaxed way and furthered the informal conversation. In contrast, defendant did not respond verbally. Defendant sat in a hunched over fashion with his arms crossed, clutching his waist. He was stone-faced and uncommunicative which struck Griffin as unusual. Griffin began to suspect a gun so he ordered defendant to stand up. Defendant stood up with his right arm clamped to his side and acted nervously.[1] Defendant made no movement to reach into his pocket or waistband. Griffin asked ‘Travis, do you have anything on you that you shouldn’t have?” Defendant nodded in the affirmative. At that point, Griffin pat frisked defendant and found a firearm on his person. Griffin bear hugged defendant so he could not move his arms and yelled “Gun!” Officer Higgins came in to the room and removed the gun from defendant. Defendant was then handcuffed and given Miranda warnings. As they waited for transport to the police station, defendant, unprovoked, yelled at Noel “Why the fuck did you open the door?” All of this took place within five minutes from when the officers first entered the apartment.
*516 Discussion
(a) Standing
As a threshold matter, defendant has standing to challenge the legality of the police entry into the apartment and the subsequent search of his person. In Commonwealth v. Amendola, 406 Mass. 592, 601 (1990), the Supreme Judicial Court adopted the automatic standing rule of Jones v. United States, 362 U.S. 257 (1960), as a matter of state constitutional law under art. 14 of the Massachusetts Declaration of Rights. The rule provides that “(w]hen a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and seizure of that evidence.” Amendola, 406 Mass. at 601.
The Commonwealth focuses on whether defendant had a reasonable expectation of privacy in Ms. Diaz’s apartment. That issue, however, presents an additional analysis to the issue of standing in only some limited cases. In most possession cases, under art. 14 of the Declaration of Rights, separate analysis of the two concepts is not necessary — standing is automatic. Commonwealth v. Mubdi 456 Mass. 385, 391 (2010); Commonwealth v. Frazier, 410 Mass. 235, 244 n.3 (1991). Article 14 gives a defendant automatic standing to challenge a search of a private place, such as ahorne. ‘Where the defendant has automatic standing, the defendant need not show that he has a reasonable expectation of privacy in the place searched. The practical consequence of automatic standing is that . . . the defendant may succeed in suppressing such evidence where the search was unconstitutional, regardless of whether he has a subj ective or obj ectively reasonable expectation of privacy in the place where the drugs or firearms were found.” Commonwealth v. Mubdi 456 Mass. at 392-93 (emphasis in original). Accordingly, because defendant is charged with possession of a gun seized during a search conducted in a private apartment, defendant has standing to challenge the legality of the search.
The Commonwealth argues, however, that defendant cannot avail himself of the automatic standing rule because he had no right to be in the apartment with a firearm, citing Commonwealth v. Lawson, 79 Mass.App.Ct. 322, 326-27 (2011), and Mubdi, 456 Mass. at 393 n.8. In Mubdi, the Court explained that there is an exception to the automatic standing rule that applies “in circumstances where the defendant was unlawfully on the property searched and where it would be inappropriate to grant him standing to challenge a search of the property.” 456 Mass. at 398 n.8. The Court referenced Commonwealth v. Carter, 424 Mass. 409, 410 (1997), for its conclusion.
In Carter, the defendant was visiting a first-floor unit in a multi-storied apartment building when the police approached the property to serve defendant with an arrest warrant. The defendant fled from the first-floor unit and was spotted on a second-floor porch and the roof before coming down. Police then inspected the second-floor porch and found cocaine and defendant’s wallet. Id. In rejecting the defendant’s motion to suppress the cocaine, the Court held that the defendant could not challenge the search because he had no reasonable expectation of privacy in the area searched. Id. at 412. The Court emphasized that the defendant “unlawfully intruded” on the second-floor property and declined “to permit a person fleeing from the police to rely on art. 14 to suppress evidence that he left on some third person’s property.” Id.
Unlike the defendant in Carter, defendant in this case was not “unlawfully” on the premises or a “trespasser.” See Lawson, 79 Mass.App.Ct. at 326 (exception to automatic standing rule where defendant is in a position of a trespasser). Because defendant was in the apartment with the permission of Ms. Diaz, the automatic standing rule of Mubdi applies. There can be no doubt that Ms. Diaz had a reasonable expectation of privacy in her residence. Under Mubdi that is enough (“The defendant, however, must show that there was a search in the constitutional sense, that is, that someone had a reasonable expectation of privacy in the place searched . . .”). Mubdi 456 Mass. at 393 (emphasis in original). See also, Commonwealth v. Holley, 79 Mass.App.Ct. 542, 551 n.7 (2011) (“Given the statements in Mubdi which is the controlling law . . . we address the reasonable expectation of privacy of both the defendant and his girlfriend”). Moreover, it is reasonable to conclude that defendant, himself, had an expectation of privacy while sitting in the bedroom of his friend’s apartment with the permission of the legal tenant of the apartment.
The Commonwealth attempts to get around the Mubdi rule by arguing a hypothetical: If Ms. Diaz would have known defendant possessed a firearm, she would not have permitted him to be in the apartment. Because it turned out that defendant had a firearm in the apartment, he was not “lawfully” on the premises. There are at least two flaws in this argument. First, it would be true in every case where a defendant is charged with possessing contraband that he could not have an expectation of privacy because, by that possession, he would unlawfully be in the location of search. In other words, if you assume the possession of contraband, the Mubdi rule is eviscerated. Instead, the limited exception to the Mubdi rule as stated in footnote 8, therein, applies to a defendant’s presence at the location of a search that is unlawful for reasons other than the possession of contraband. Second, the hypothetical advanced by the Commonwealth overlooks the interest Ms. Diaz had in not having her residence subjected to an unconstitutional search. “The right of police officers to enter a home, for whatever purpose, represents a serious governmental intrusion into one’s privacy.” Commonwealth v. Porter P., 456 Mass. 254, 269 (2010) (quoting Commonwealth v. Peters, 453 Mass. 818, 819 (2009)). That interest is, in part, what is protected by the Mubdi rule. Otherwise, police could execute warrantless searches of *517 private residences with the intent of using the evidence against a person who does not reside at the premises, without regard to the owner’s constitutional right to be secure from unwarranted search and seizure.
(b) Consent
Given defendant’s standing, the issue becomes whether the warrantless search was unconstitutional. “Warrantless entries into the home are prohibited by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of rights absent either probable cause and exigent circumstances, or consent.” Commonwealth v. Rogers, 444 Mass. 234, 236 (2005). In this case, the Commonwealth justifies the warrantless entiy on the ground that Ms. Diaz’s son, Noel, consented to the officers’ entiy. “When the police rely on consent to justify a warrantless entiy, under both the Fourth Amendment and art. 14, the prosecution has the burden of proving that the consent was, in fact, freely and voluntarily given.” Id. at 237 (internal quotations omitted).
To meet its burden, the Commonwealth must show consent unfettered by coercion, express or implied, and also something more than mere acquiescence to a claim of lawful authority or simple resignation to the perceived power of uniformed officials. Rogers, 444 Mass. at 238; Commonwealth v. Voisine, 414 Mass. 772, 783 (1993). Consent must be unambiguous; “[i]f either the officer’s request or the occupant’s response is so ambiguous that we are unable to discern whether the occupant voluntary consented to [the search], our inquiiy will be over and the entiy must be deemed unlawful.” Commonwealth v. Carr, 458 Mass. 295, 299 (2010) (quoting Rogers, 444 Mass. at 239-39).
Here, in light of the totality of the circumstances, I find that the Commonwealth fails to meet its burden of establishing that Noel voluntarily consented to the police entiy of the home or the police entiy of Aveiyk’s bedroom.[2] The conduct relied upon by the Commonwealth — Noel’s “freely stepping aside” action — is too ambiguous to establish that Noel voluntarily consented to the police’s entiy into the home. See generally Rogers, 444 Mass. at 239-42 (discussing ambiguity). First, the police did not expressly ask for permission to enter the home, but merely inquired into whether the defendant was home. See Rogers, 444 Mass. at 239 (officer’s question as to where he could find defendant is ambiguous because it can be interpreted either narrowly as merely a question concerning the whereabouts of defendant or more broadly as including a request to enter the home). Noel’s response constituted only gesturing to his left (either by pointing or looking) and stepping aside (either freely or to make room for the officers already entering). In either event, his conduct was not sufficiently unambiguous to constitute voluntary consent, especially given the lack of any verbal response. See Rogers, 444 Mass. at 240 (finding stepping aside conduct in response to inquiiy into defendant’s whereabouts ambiguous). Further, Noel testified that he was “shocked” that the officers just walked in and I credit that testimony. Although it is possible for such conduct — either pointing or freely stepping aside — to constitute consent, see e.g. Commonwealth v. Hill, 44 Mass.App.Ct. 240, 244 (2003), and Voisine, 414 Mass. at 776, the circumstances of this case have more in common with Rogers than those cases. The cases finding consent are distinguishable in that they contain “significant indicia of voluntariness” that are not present here. Rogers, 444 Mass. at 242.
In addition, there are substantial questions as to whether any alleged consent was voluntary. “The question of whether consent was voluntary is a question of fact to be determined in the circumstances of each case, with the burden of proof on the government.” Carr, 458 Mass. at 302 (citing Commonwealth v. Aguiar, 370 Mass. 490, 396 (1976)). To determine whether consent was voluntarily given or merely an acquiescence to a claim of lawful authority, courts will consider, among other factors, whether the police officers were armed, whether the consenting individual was informed of his right to refuse consent, and the age, intelligence, and other personal characteristics of the consenting individual. See id. at 302 (citing Sanna, 424 Mass. at 97-98 n. 10). Here, while the officers were in plain clothes, they were both armed and wearing badges around their neck. Noel was not informed of his right to refuse, and one of the police officers was holding a piece of paper in his hand when Officer Griffin asked Noel for Aveiyk’s whereabouts, which may have suggested to Noel, a minor at the time, that the police had the authority to be there. See Carr, 303 (fact that officer’s first acts had a “compulsoiy dimension to them” casts doubt on voluntariness of consent). Moreover, Noel was an unsophisticated minor who was unaware of the right to refuse entry. In addition, the ambiguity in the alleged consent contributes to the finding of a lack of voluntariness. Rogers, 444 Mass. at 242 (distinguishing cases finding consent on the basis that they “lack the ambiguity that is fatal to the Commonwealth’s claim of consent in this matter”). Here, as in Rogers, the “multiple ambiguities in the officer’s question and [the occupant’s] response only compound the deficiency of the Commonwealth’s assertion that [the occupant] voluntarily consented to the entiy” in this case. 444 Mass. at 242.
The warrantless entiy, not consented to, and the subsequent search violated constitutional principles. Evidence seized in connection with that violation must be suppressed. Defendant makes the additional, alternative argument that, even if the police were lawfully in the bedroom, there was no reasonable suspicion to justify the stop and frisk of defendant by Officer Griffin. That argument is addressed in the next section.
(c) Stop and Frisk
Under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, the police may perform an investigatory stop, or Terry stop, upon reasonable suspicion that the person has committed, is committing, or is about to *518 commit a crime. Commonwealth v. Costa, 448 Mass. 510, 514 (2007). Reasonable suspicion must be based on specific, articulable facts and reasonable inferences therefrom. Id. A weapons frisk is permissible in a Terry stop if “a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.” Terry v. Ohio, 392 U.S. 1, 27 (1968).
Here, Griffin had personal knowledge that two of the individuals present in the bedroom — Walker and defendant — had prior firearm offenses and were involved in gang activity. See Commonwealth u. Dasilva, 66 Mass.App. 556, 561 (2006) (knowledge of past criminal activity is one factor to be considered). During the course of the interaction, Griffin further noticed that defendant was behaving unusually, including being uncommunicative and clutching Iris waist. When Griffin instructed defendant to stand up, defendant covered his right side with his arm and acted nervously. When Griffin asked defendant if he had anything in his possession he should not have, defendant nodded affirmatively. Additionally, Griffin is a member of the youth violence strike force (or gang suppression unit) and has considerable experience and training in dealing with possible gang members and persons suspected of having a firearm. See Commonwealth v. O'Day, 440 Mass. 296, 302 n.6 (2003) (officer’s training may be taken into account in evaluating whether there was reasonable suspicion). The combination of these factors provided Griffin with reasonable suspicion that defendant may have been illegally carrying a firearm.
The frisk was justified by concerns for the officers’ safely under the protective frisk doctrine. See Commonwealth v. Fraser, 410 Mass. 541, 544-45 (1991) (discussing protective frisks); but see Commonwealth v. Narcisse, 457 Mass 1, 9 (limiting the holding of Fraser). The facts of this case are analogous to those in Commonwealth v. Mathis, 76 Mass.App.Ct. 366, 367-68 (2010). The police approached defendant with a “conversational approach,” which typically does not rise to the level of a seizure. Mathis, 76 Mass.App.Ct. at 369. The police were outnumbered in close quarters with two individuals whom the police knew to be involved in gang activity. Defendant, in particular, was clutching his right side and acting nervously, and eventually indicated that he possessed something illegal on his person. Under such circumstances, the police lawfully stopped and frisked defendant. See Mathis, 76 Mass.App.Ct. at 367-68; see also Commonwealth v. Nestor, 67 Mass.App.Ct. 225, 229-30 (2006) (“[a] police officer may stop and frisk an individual for the officer’s own safety and the safety of others if the circumstances reasonably suggest that the person is armed and dangerous”).
Order
For the foregoing reasons, the motion to suppress the discovery and seizure of the firearm, as well as all statements by defendant made in connection with the illegal search and seizure, is ALLOWED.

 At the hearing, defendant offered the testimony of his mother and a close friend of defendant’s mother who were at another location at the time of the search. The mother’s testimony was, in general, that she talked with her son, the defendant, by cell phone several times per day and on the day in question she called him. During the call, she heard someone say defendant’s name and then defendant said “hold on, Mom” but then did not come back to the phone. The purpose of this testimony was to suggest that defendant was on his cell phone while in the bedroom with Officer Griffin, in contrast to the testimony of Officer Griffin describing defendant. I find the testimony of defendant’s mother and friend to be too speculative, remote and unconnected to the actual circumstances of the search to have any probative value.

 Even if consent could be found for entry into the apartment to serve the subpoena on Averyk, there was no consent to allow the police to enter the bedroom. By the time of entry into the bedroom, Averyk had already exited the bedroom and was available to receive the subpoena. See Commonwealth v. Thomas, 67 Mass.App.Ct. 738, 740-41 (2006).